Hillsborough,
March 5, 1912.

### Bowditch & *a.* *v.* Jackson Co. & *a.*

The authority of a majority of the stockholders to dissolve a private corporation depends solely upon the agreement between the incorporators, and not upon any powers granted by the state.

A majority in interest in a private business corporation have implied authority to sell all the corporate property for an adequate price and effect a dissolution of the company, when in the fair and honest exercise of their judgment they conclude that such course will be advantageous to the shareholders.

Where a majority of the stockholders of a private corporation vote to sell all its property and to accept therefor stock in the purchasing company, with a provision that any shareholder who so elects may receive payment in cash, their action is not invalid on the ground that it infringes the original agreement by embarkation in a new business, nor because it constitutes a purchase of the stock of the vendee corporation and is *ultra vires* for that reason.

An agreement whereby three fourths of the stock of a corporation is transferred to trustees, who are to hold the same for one year, vote it in favor of a proposed sale of the corporate property, distribute the proceeds, and take necessary steps to wind up the company's affairs, is not open to objection, when it appears that its execution will work no wrong to the corporation and confer no special benefit upon the shareholders who are party to the compact.

Where a charter provides that absent members of the corporation may be represented and vote at meetings by agents authorized in writing, a shareholder duly appointed may act as proxy for other shareholders.

Action taken at a meeting of a corporation cannot be set aside because of illegal affirmative votes which did not affect the result.

A sale of all the effects of a corporation by a majority of the stockholders, for the purpose of dissolving the company and distributing its assets, is not a taking of the property of the minority without their consent, but a proceeding authorized by the original agreement of the incorporators.

Minority stockholders of a corporation in process of dissolution are not entitled as matter of right to have the value of the corporate assets determined by public auction, instead of by private sale in accordance with a vote of the majority shareholders.

A court of equity will not interfere in the liquidation of the assets of a corporation by a majority in interest, unless it appears that the majority are assuming to exercise powers not conferred upon them, or are proceeding in a manner not authorized by law.

Where a sale of corporate property by a majority in interest is free from all taint of fraud or irregularity, a court of equity will not interfere unless there be such inadequacy of price as to prove gross mismanagement; and in such case it is incumbent upon the objecting shareholders to prove that the majority have been guilty of a violation of duty.

Bill in Equity, to enjoin a sale of the assets of the Jackson Company to the Nashua Manufacturing Company. The plaintiffs are stockholders of the Jackson Company and allege in their bill that, through control exercised by common directors, the defendants were about to execute a conspiracy to sell the assets of the Jackson Company to the Nashua Company, for an inadequate price, payable in Nashua Company stock; that in furtherance of this conspiracy, the officers had procured the assent of the holders of 460 of the 600 shares of Jackson Company stock to a trust agreement whereby they were irrevocably bound for one year to vote for the sale; and that a meeting of the stockholders had been called to consider the proposed action. In the superior court, *Wallace*, C. J., ordered the injunction, but later so far modified it as to permit holding the meeting and passing the votes as to the sale, the same to be effective if the injunction was thereafter dissolved. The hearing on the merits was had before *Plummer*, J., who reported the facts and transferred the case without ruling from the May term, 1911, of the superior court.

In the fall of 1910, committees of the boards of directors of the two companies were appointed to consider the advisability of the sale and purchase. They reported recommending such sale on the basis of the Nashua Company paying in its own stock at the rate of one and a half shares of $500 par value for each share of Jackson Com-

pany stock of $1,000 par value. After this recommendation was made, holders of 446 shares of Jackson Company stock entered into a trust agreement whereby their stock was transferred to certain trustees to hold the same for one year, to vote it for the proposed sale, and to distribute the proceeds of the sale and take necessary steps to wind up the company. Aside from these particulars, the trustees were left free to exercise their judgment in voting the stock, but were to make no substantial change in the business or condition of the corporation, except as above specified.

After the injunction was modified, a meeting of Jackson Company stockholders was held, at which it was voted (subject to the injunction proceedings) to make the sale and wind up the company, to sell the stock of the Nashua Company not taken by Jackson Company stockholders, and to distribute the proceeds among them. At this meeting 490 shares were voted in favor of the sale and 104 against it. Of the 490 shares, 446 were voted by the trustees and the balance by individual holders or their proxies. The plaintiffs protested the legality of the action.

The market value of the Jackson Company stock has been and is $975 a share, and that of the Nashua Company stock, $650. After the sale was voted, a standing offer was secured from the American Trust Company of Boston to take the Nashua Company stock not taken by Jackson Company stockholders at $650 a share. The price to be paid to the Jackson Company stockholders is adequate, and the proposed exchange of stock is equitable. The officers, directors, trustees, and attorneys who were engaged in promoting the sale have acted in good faith and for the best interests of both companies, according to the best of their judgment. All the terms of the proposed transaction are fair and equitable.

*Tyler & Young* (of Massachusetts), *Remick & Hollis, Alexander Murchie,* and *Robert C. Murchie* (*Mr. Hollis* orally), for the plaintiffs.

*Peabody, Arnold, Batchelder & Luther* (of Massachusetts) and *Streeter, Demond & Woodworth* (*Mr. Demond* orally), for the defendants.

Peaslee, J. 1. The main question in this case is whether a going business corporation can be closed out and dissolved upon the motion of the majority of its stockholders and against the protest of the minority. The question is a new one in this state, although

it has frequently been considered (both in cases where it was necessarily involved and those where·it was not) by the courts in other states.   The decisions and *dicta* are conflicting and are quite evenly divided.   In the following cases the existence of the power is denied, though in most of them the question was not necessarily involved: *Abbot* v. *Rubber Co.*, 33 Barb. 578;   *People* v. *Ballard*, 134 N. Y. 269;   *Kean* v. *Johnson*, 9 N. J. Eq. 401;   *Forrester* v. *Mining Co.*, 21 Mont. 544.   That the power exists is decided ʼor declared in other cases:   *Treadwell* v. *Company*, 7 Gray 393;   *Phillips* v. *Company*, 21 R. I. 302;   *Black* v. *Canal Co.*, 22 N. J. Eq. 130, 404 (overruling *Kean* v. *Johnson*, 9 N. J. Eq. 401);   *Merchants etc. Line* v. *Waganer*, 71 Ala. 581;   *State* v. *Company*, 115 Tenn. 266; *Tanner* v. *Railway*, 180 Mo. 1;  *Arents* v. *Company*, 101 Fed. Rep. 338.

The only case in this state having a direct bearing upon the subject is *Dow* v. *Railroad*, 67 N. H. 1.   In that case there was an attempt to change the business of the corporation;   and while any expression of opinion on the question here involved was carefully avoided, yet the opinion of Chief Justice *Doe* contains an exhaustive and illuminating discussion of the nature of a corporation and the source of the power of the majority to act for it.   The majority have the agency which in a partnership each partner possesses. Do they, in addition thereto, have the power each partner has to compel a dissolution?   The corporation being an outgrowth of the law of partnership, it would be reasonable to expect that so important an incident to the joint undertaking as the right to terminate the enterprise would not be lost by the change in the form of the association.   The fiction that the corporation is a being independent of those who are associated as its stockholders is not favored in this state.   *Dow* v. *Railroad, supra,* 3.   Decisions based upon the idea that there is something sacred in the life of an ordinary business corporation, so that action looking to its extermination is in the nature of a fraud upon the state (*People* v. *Ballard,* 134 N. Y. 269), are not authority in a jurisdiction where a different view of the nature of the association is entertained.   The question is not one of power granted by the state.   It relates solely to the agreement of individuals with each other.

Did the stockholders who united to form the Jackson Company in 1830 understand that the business must be continued perpetually, provided a profit could be made and some stockholder objected to closing it out, or did they understand that the enterprise could be

brought to an end at such time as the majority believed to be for the best interest of all concerned? The latter seems the more reasonable and probable conclusion.

Much has been said in the cases upholding the right of the minority to prevent a sale and dissolution, concerning the protection of their rights and saving their property from pillage by the majority. Just how the majority, which sells its own property at the same time and for the same price it sells that of the minority, gains an advantage over the latter is not readily apparent. Cases might be supposed, and undoubtedly occur, where the majority do obtain some undue advantage from the sale. No one contends that such a sale is valid. But because the power of the majority may be abused, it does not follow that it does not exist. If such a conclusion were to be drawn, minorities would always rule. The plain common-sense of the matter is that this is a business venture, to be carried on as such so long as it appears to be good business judgment to do so. When the time comes that a majority in interest believe that their affairs should be wound up and the proceeds distributed, the rational rule is that this should be done. And since the question here is of a business nature, and the limitations of the power of the majority are fixed by the understanding of the business men who made the original compact, business considerations have more than ordinary weight in determining what the contract was.

It is admitted on all sides that the majority may sell out if the corporation is insolvent. And when brought face to face with the question whether they must wait until the stockholders' investment is all lost before taking action, the conclusion has been that if insolvency is imminent action may be taken. And the same is true if it is imprudent to continue. 4 Thomp. Corp., *s.* 4489, and authorities cited. One reason only is given why the power exists in these cases: it is reasonable to suppose that such authority was contemplated, because this is what sound business judgment dictates should be done. The difference between these cases and the present one is of degree only, not of kind. The majority are not obliged to wait until all possibility that the corporation can go on longer has been negatived. Some of the cases have stated that such is the rule; but the result of this would be to compel the majority to continue a losing business until their investment was entirely wiped out. To avoid so absurd a result, it has been said they could close out when insolvency seemed to be approaching. And so

various forms of expression have been used to indicate the time when the majority could take action. All these are fairly summed up in the statement that the majority may close out the affairs of the company when it can no longer make a reasonable profit. It is believed no court would now hold that the rights of the minority were more extensive than this rule implies.

If the majority may sell to prevent greater losses, why may they not also sell to make greater gains? Bearing in mind that this is purely a business proposition, with no public rights or duties involved, there seems to be no substantial difference between the two cases, as a matter of principle. In each case, the sale is made because it is of advantage to the stockholders. Whether the profit to be made is a reasonable one, must be a relative matter. Three per cent when others make two might be reasonable; but three per cent when a sale could be made which would yield the stockholder ten could hardly be thought an investment a reasonable person would retain. The loss to the stockholder by a failure to sell out on a basis which would yield him ten per cent instead of the three he is receiving is in fact much greater than it would be if a concern went on neither making nor losing when the investment would earn four per cent elsewhere. It does not seem reasonable that the majority should have power to make a sale in the latter case, and not in the former. In neither case would the sale prevent positive loss, but in each it would result in positive gain. And the question is one of future prospects. Its decision requires the exercise of business judgment, sagacity, and power to forecast coming events. It is not an issue appropriate for trial and decision in courts, but rather one to be settled by the judgment of the men conducting the business in question. In a limited sense, the majority act as trustees for all the stockholders. When their acts are impugned by the minority, it is not the function of the court to set its judgment against theirs in settling the wisdom or policy of proposed action. By the contract of association, all questions of this nature were committed to the majority for final decision. *Gamble* v. *Water Co.*, 123 N. Y. 91, 99.

The whole difficulty is probably an outgrowth of the early idea that a corporation possessed peculiar attributes of longevity and sanctity. But as pointed out in *Dow* v. *Railroad*, 67 N. H. 1, 8, 26, no such theory prevails here. The business corporation is brought into being solely for the purpose of more conveniently carrying out the joint undertaking of the part owners. The line

of distinction between this form of association and certain partnerships is but a shadowy one.  *Ib.* 8.  It is not reasonable or natural to expect that when this boundary is passed great changes in the relation of the parties will result.  A more radical change than that here claimed could not easily be imagined.  In the partnership, one partner may compel a winding up from mere whim.  In the absence of an agreement to go on for a fixed period of time, nothing short of a fraudulent purpose will prevent his taking valid action to close out the firm at will.  *Fletcher* v. *Reed*, 131 Mass. 312; Lind. Part.*570.  By the rule here contended for, the change of the association into a corporation has carried the rule to the opposite extreme.  The authority to wind up is lost, and the owner of the smallest share may prevent such action, though it is desired by all his associates.  The practical reasons against such a proposition are apparent.  The probabilities are opposed to the idea that the associates intended to enter into such a compact.

It is urged that the analogy of the partnership right does not apply, because the stockholder can sell his shares and so terminate his connection with a management with which he is dissatisfied. It is true he has this legal right; but it is not true that it is an adequate remedy, when a majority desire to retire from the business. The proposition is a practical one.  It is not disposed of by offering to the majority a naked legal right the exercise of which will probably deprive them of a considerable share of their property.  Partnerships are sometimes formed with transferable shares, but this does not impair the right to compel a dissolution.  In the case of special or limited partnerships, the rule is that the general law of partnership applies unless modified by statute or special agreement. *Tyrrell* v. *Washburn*, 6 Allen 466.  Accordingly it was held that where shares in the firm were transferable, and additional shares were issued from time to time, a partner who wished to retire could compel a dissolution and winding up of the firm.  *Ib.*  The fact that (as in a corporation) the dissatisfied owner could sell his shares, was not sufficient to take away his right to other remedies.

The action taken by a majority of the stockholders of the Jackson Company whereby, as a part of the process of winding up the company, they voted to sell all its property to the Nashua Company, was within the power impliedly given to them when the company was formed.  The charges that there was fraud in the sale and that it was for an inadequate price have been disproved.  Two other causes of complaint remain to be considered.

2. It is urged that because the payment for the property of the Jackson Company was to be made in stock of the Nashua Company, therefore the sale was invalid, because the stockholder never agreed to embark in the Nashua Company's business.  It is not necessary to examine this question now.  Assuming for the purposes of this decision that the position is well taken, its effect is avoided by the provision that a stockholder may have cash instead of Nashua stock.  Arrangement having thus been made whereby any stockholder can receive his share of the proceeds of the company's assets in money, his rights are not infringed by a stipulation (in the benefits of which he can share if he so elects) that stockholders may receive Nashua stock instead of money.  *Koehler* v. *Brewing Co.*, 228 Pa. St. 648.

The plaintiffs now suggest that the Trust Company option is not a sufficient guaranty that the cash will be paid to them.  The defendants say that they procured the option as the best available proof of their good faith in making the offer to pay cash to the dissenting stockholders.  Until it was settled that the agreements were to be carried out, it would not be expected that the money to pay for the stock would be paid over, or deposited as security. It is assumed that this will now be done by the defendants, under such an order as to details of the transaction as the superior court may make, or the parties may agree upon.

The claim is also made that a purchase by the Jackson Company of Nashua Company stock is *ultra vires* and voidable.  But the substance of this transaction is not a purchase of stock by the Jackson Company.  That company is to be dissolved, and in the process of dissolution the proceeds of its property are to be divided among its shareholders.  The Nashua Company pays $585,000 for the property.  Those who desire to receive payment in stock can do so, and cash will be paid to those who do not wish to invest in the stock.  So far as the Jackson Company takes the stock at all, it is merely to transfer it to those who elect to take it, or to sell it for the guaranteed price and pay the proceeds to those who wish to receive money instead of stock.  If the form of the agreements and offers, taken as a whole, infringes the rule here invoked, the substance is not open to such objection.  In such a case equity ought not to interfere.

3. The legality of the votes passed at the meeting of the Jackson stockholders is questioned on account of the nature of the trust agreement under which the majority of the stock was then held,

and because the trustees voted more than one eighth of the entire stock.　While the decisions upon the first question are not entirely in accord, yet substantially all of them recognize that an agreement to vote stock in a certain way may be valid.　The rule is well stated in the case chiefly relied upon by the plaintiffs.　"If the transfer of the legal title to the stock is made and accepted under an agreement of the stockholder which deprives him of all power to direct the trustee, and all opportunity to exercise his own judgment in respect to the management of the affairs of the corporation, then whether the transaction is open to the objection of other stockholders, as depriving them of the right they have to the aid of their co-stockholders, must be dependent upon the purposes for which the trust was created and the powers that were conferred.　If stockholders, upon consideration, determine and adjudge that a certain plan for conducting and managing the affairs of the corporation is judicious and advisable, I have no doubt that they may by powers of attorney, or the creation of a trust, or the conveyance to a trustee of their stock, so combine or pool their stock as to provide for the carrying out of the plan so determined upon.　But if stockholders combine by either mode to entrust and confide to others the formulation and execution of a plan for the management of the affairs of the corporation, and exclude themselves, by acts made and attempted to be made irrevocable for a fixed period, from the exercise of judgment thereon, or if they reserve to themselves any benefit to be derived from such a plan to the exclusion of other stockholders who do not come into the combination, then in my judgment such combination and the acts done to effectuate it are contrary to public policy, and other stockholders have a right to the interposition of a court of equity to prevent its being put into operation." *Kreissl* v. *Distilling Co.*, 61 N. J. Eq. 5, 14.

An examination of the cases generally will disclose that in nearly all of them where the agreement was held invalid there were stipulations or covenants which infringed this rule.　The propositions that "it is as legitimate for a majority of stockholders to combine as for other people," and that the combination is unlawful only if "the gain was to be at the expense of the corporation, or in some way was to work a wrong to the other stockholders" (*Brightman* v. *Bates*, 175 Mass. 105, 110), are generally recognized as sound law. *Chapman* v. *Bates*, 61 N. J. Eq. 658; *Faulds* v. *Yates*, 57 Ill. 416; *Smith* v. *Railway*, 115 Cal. 584.　Even the cases holding the particular agreements then under consideration to be invalid usually

recognize the proposition that there may be a valid voting trust. *Shepaug Voting Trust Cases*, 60 Conn. 553, 579; *Gage* v. *Fisher*, 5 No. Dak. 297.

Judged by these standards, the agreement in the present case seems unobjectionable. The trust is to terminate at the end of a year in any event. It contemplates the winding up of the corporation within that time, and sets out in detail the plan of sale and dissolution for which the trustees were authorized to vote. It further provides that the trustees shall not vote so as to substantially change the company's business, except as specifically authorized. There is nothing here which seeks to work a wrong to the corporation, to confer a benefit upon those joining in the trust, or to turn the management of the stockholders' affairs over to strangers. Judged by the strictest rule of a stockholder's right to the free and honest judgment of his co-stockholders, the agreement here made by more than three fourths of the stockholders is a legitimate arrangement for carrying out their purpose to close out the affairs of the company.

The argument that each stockholder is entitled to the presence of his associates to the end that they shall reason and be reasoned with is not of weight here. The rule of the common law was that no member of a corporation could vote by proxy. 1 Thomp. Corp., s. 875, and cases cited. But the charter of this company introduces a different doctrine. "Absent members may be represented and vote at such meetings by an agent for that purpose duly authorized by writing, signed by the member or members to be represented." Act to establish a manufacturing corporation, by the name of the Jackson Company, 32 Ms. Laws 197 (1830). It is not necessary to now consider what effect the act of 1842, forbidding all proxy voting, giving one vote for each share up to ten, one vote for every two shares between ten and twenty, and no more (R. S., c. 146, s. 20), had upon this right. *Dow* v. *Railroad*, 67 N. H. 1, 25, *et seq.* The act of 1842 was repealed four years later, and the principle of general proxy voting was adopted. Laws 1846, c. 321, s. 5. The limitation of the right, incorporated in the revision of 1867 (G. S., c. 134, s. 21), was removed in 1901; so that now a proxy can represent more than one stockholder, and one stockholder can be proxy for another. Laws 1901, c. 68. Whether the charter or the general law applies here, the rule is that one or many stockholders may be represented at the stockholders' meeting by an agent.

The claim that the votes cast by the trustees were invalid because

they were in effect votes by proxy, and that one stockholder cannot act as proxy for another stockholder, nor can a proxy act for more than one stockholder (P. S., c. 149, s. 22), is answered by the act heretofore referred to. The statute has been repealed. Laws 1901, c. 68. If the statutes authorizing voting by proxy do not apply to a corporation chartered in 1830, then the charter of this company plainly confers rights as broad as those here exercised.

The trustees voted more than one eighth of the whole capital stock, but such action did not affect the result. In any event, they lawfully voted seventy-five shares. Forty-four other shares were voted the same way, and 104 shares were voted against the sale. It is therefore unnecessary to consider whether the statute, passed after the charter was granted and restricting the right to vote on large holdings of stock (Laws 1846, c. 321, s. 5), can affect the rights of these stockholders. As the result was not affected by the action complained of, the vote to sell cannot be set aside for such cause. *Attorney-General* v. *Folsom*, 69 N. H. 556.

*Case discharged.*

All concurred.

After the foregoing opinion was filed, on January 2, 1912, the plaintiffs moved for a rehearing upon the legality of the sale, and further argument was invited upon the method of liquidating the assets.

*Tyler & Young* (of Massachusetts) and *Remick & Hollis* (*Mr. Hollis* orally), for the motion.

*Peabody, Arnold, Batchelder & Luther* (of Massachusetts) and *Streeter, Demond & Woodworth* (*Mr. Arnold* orally), opposed.

PEASLEE, J. The plaintiffs now object to the proposed sale upon the grounds (1) that the dissolution amounts to a taking of their property against their consent, (2) that in closing out a partnership any partner can compel an auction sale of the property, and (3) that the defendants have agreed for a sale to themselves.

1. The claim of a right to a sale by auction, or a price fixed by a jury, is based first upon the assumption that there is here a taking of the plaintiffs' property *in invitum*, and that this cannot lawfully be done except upon such an ascertainment of value. If it were

true that this amounted to such a taking, then the proceeding could not be upheld upon any theory. Private property cannot be so taken except for public use. But there is here no taking of property whatever. It is a mere question of contract and of carrying the contract into effect. If it is true (as the plaintiffs now admit) that a dissolution of the corporation and a distribution of its assets is a part of the original undertaking of the incorporators, then a sale for the purpose of such distribution is no more a taking of the stockholder's property than a sale of the corporation's manufactured product in the ordinary course of trade would be. In each instance there is a sale of property in which he has an interest. It may be that in each case he protests against the particular transaction. But his present protest cannot revoke his prior consent to a method of doing business which is now being followed, nor can his attempted withdrawal of consent make a proceeding to which he has agreed a taking of his property.

2. The contention that the plaintiffs are entitled as a matter of right to their proportion of the proceeds of all the assets as fixed by an auction sale is also urged upon the assumption that the best selling price reasonably obtainable cannot otherwise be found. Each owner's right is to his proportion of the net proceeds of all the assets. He is entitled to his share of what the property can be sold for, as distinguished from what it is worth. If this implies that the assets must be sold, it does not necessarily involve an auction sale. It not infrequently happens that such a sale would be ruinous, when one by private agreement could be negotiated for a fair price and to the advantage of all concerned. Sales at public auction have been ordered because it was thought that in this way a fair sale and the highest price would be assured. This is not because the parties have a vested right to have the value so fixed, but because courts have thought that the business transaction of liquidation (when imposed upon courts) would be better carried out in this way. It was merely a means for giving the parties their rights in the proceeds. It was not a right in and of itself.

Even in the early English reports, cases are found where sales other than at auction were approved by the chancellor, some going so far as transferring the interest of a minor heir to a surviving partner. In a later case in the house of lords these authorities are reviewed and the true rule is laid down.

"It is very true, as was said at the bar, that on dissolving a partnership of this kind the ordinary course would be for the court to

direct a sale of the assets, and if necessary, a sale of the concern as
a going concern, and to give liberty for proposals to be made by
either party to purchase it before the judge in chambers.   My lords,
those provisions are moulded in every case by the court to meet the
circumstances of the particular case; and it appears to me that,
looking at the nature of this business, and looking at the very small
interest which was taken in it by the respondent [one eighth], it
would certainly not be desirable in this case to have a sale, or to
bring these premises to the hammer for the purpose of ascertaining
what sum ought to be given for them.   It is a case therefore in
which, if a decree for a dissolution had been made in the first in-
stance, I apprehend that the court would have thought it right to
authorize the owner of seven eighths of the concern to lay proposals
for a purchase before the judge in chambers.   I am about to submit
to your lordships a provision which will, I think, in another way
arrive in substance at the same end."

The following decree was entered:   (1) An account for mesne
profits.   (2) "That an inquiry be made what sum would,. on the
21st of February, 1873, have represented the respondent Daniel
Backhouse Syers' one-eighth share in the value of the said music
hall and tavern if it had then been sold as a going concern, after
deducting all charges thereon and all liabilities of the business."
(3) That upon payment of these sums within a time to be fixed by
the judge in chambers, no farther accounts be taken.   (5) If pay-
ments are not made as ordered, there must be a sale in the usual
way.   *Syers* v. *Syers*, 1 A. C. 174.

In commenting on this case, it is said in Lindley on Partnership:
"Moreover, in *Syers* v. *Syers* it was held by the house of lords, that
in the case then before it the court could, in its discretion, either
order the sale of the undertaking as a going concern, or approve of
the purchase by one partner of the share of his copartners.   The
rule as to selling partnership property is merely adopted in order
that justice may be done to all parties, when no other course has
been or can be agreed upon.   It is not an arbitrary rule inflexibly
applied in all cases whether it is necessary or not; and although,
if one partner or his representative insist on a sale, the court may
not be able to refuse to enforce that right, still the court is always
inclined to accede to any other mode of settlement which may be
fair and just between the parties."   And in a foot-note:   "And,
*qu.*, whether the discretion alluded to exists in all cases?   But why

should it not?   Its exercise would often be most beneficial:" Lind. Part. (7th ed., 1905) 587.

"A sale is, generally speaking, that method of disposing of the property, or facilitating its division, which is least open to the danger of fraud or mistake, and is therefore much favored.   .   .   . It must always be possible that the peculiar circumstance of the case may make a sale injurious, and that the true interests of all parties may be better protected and preserved without it; and then a court is under no obligation to require a sale." Pars. Part. (4th ed.), *s.* 420.

There is no one hard and fast rule for adjusting partnership affairs in court proceedings, and the claim that the partners' shares can be determined only by an auction sale is not well founded. *Mauck* v. *Mauck*, 54 Ill. 281; *Taylor* v. *Hutchinson*, 25 Grat. 536. The suggestion that an order for a sale of the net Jackson assets at auction, limiting the lowest bid to the price fixed by the sale to the Nashua Company, may produce good results and can do no harm, rests upon the assumption that the present offer would still be open to acceptance if the auction failed to develop a higher bidder.   But conceding this, it must also be evident that an attempt to sell at auction might do no good.   It is at most a question of the best sale price and how to obtain it.   If upon the evidence the court is satisfied that this has been obtained, there is no occasion for further proceedings to secure additional evidence on the point. If the court thought the question was not satisfactorily answered by the evidence, it might be appropriate (in a case where cause was shown for liquidation by the court) to order the sale at auction, or in some other way.   That the auction sale is not an absolute right is stated in terms in the opinion in *Mason* v. *Pewabic Co.*, 133 U. S. 50, the authority chiefly relied upon by the plaintiffs:   "We do not say that there may not be circumstances presented to a court of chancery, which is winding up a dissolved corporation and distributing its assets, that will justify a decree ascertaining their value, or the value of certain parts of them, and making a distribution to partners or shareholders on that basis; but this is not the general rule."   Even with this qualification, Mr. Justice *Bradley* stated his opinion to be that "the opinion of the court asserts too strongly the right of the minority stockholders to insist upon a sale.   In many cases in this country, a valuation of the interest of a minority, under the direction of the court, has been deemed a proper method of

ascertaining their share in the assets, where a sale would be prejudicial to the interests of the whole."

This is the law in cases where the liquidation of the assets is in the hands or under the direction of the court. But liquidation is not necessarily a judicial proceeding, nor can judicial action in reference to it be invoked, except for cause. The plaintiffs' whole contention is based upon the assumption that in every case of dissolution the liquidation is a matter for judicial administration, unless the parties are entirely agreed. The law is otherwise. It is not a matter of course that a court of equity will interfere in the liquidation of the assets of a corporation or firm by a majority in interest. It is the right of the parties to conduct this part of their business for themselves. Before this right can be interfered with, it must be made to appear that the majority are assuming to exercise powers not conferred upon them, or are proceeding in a manner not authorized by law.

The typical cases where receivers or sales have been ordered are those where there were only two partners. In case of a disagreement, there was no majority either way. But no case has been cited, where, in case of more than two partners, the honest and judicious action of the majority in closing out the property has been reviewed by a court of equity. In the case at bar cause for a receivership was alleged, but not proved. If it had been established, then the question what kind of a sale should be ordered by the court would arise, as in *Syers* v. *Syers*, before cited. No cause for a receiver being shown, and the allegations of misconduct having been disproved, it follows that the action of the majority cannot be interfered with.

After a dissolution, each partner still has implied authority to dispose of the firm property by sale or other reasonable mode, necessary for the purpose of winding up the firm. *Lapenta* v. *Lettieri*, 72 Conn. 377; *Robbins* v. *Fuller*, 24 N. Y. 570; *Gray* v. *Green*, 142 N. Y. 316; *Walling* v. *Burgess*, 122 Ind. 299; *Bach* v. *Insurance Co.*, 64 Ia. 595; *Barton* v. *Lovejoy*, 56 Minn. 380; *Shanks* v. *Klein*, 104 U. S. 18.

"The dissolution of a partnership terminates the capacity of the individual partners to continue the firm business with the partnership property and assets, and to incur debts in the firm name. But the partnership property will remain to be disposed of and its assets to be collected, and partnership debts must be paid. . . . Notwithstanding the dissolution of the partnership, the firm con-

tinues to exist for all purposes necessary for winding up its affairs; otherwise, as was said by Lord Justice *Turner*, it would be necessary to apply for a receiver in every case upon the dissolution of a partnership. *Butchart* v. *Dresser*, 4 DeG. M. & G. 542, 544. If partners have not provided for the manner in which the affairs of the partnership shall be wound up, the law provides therefor by continuing the partnership, with its incidents of interest, powers, and obligation, for the purpose of winding up the concerns of the partnership so far as is necessary to that end and no further. Pars. Part. 420." *Davis* v. *Megroz*, 55 N. J. Law 427, 431.

The power of partners to so close out their affairs is not curtailed by courts in the absence of proof of illegal acts, or at least of gross incompetence. *Birdsall* v. *Colie*, 10 N. J. Eq. 63; *Cox* v. *Peters*, 13 N. J. Eq. 39; *Nathan* v. *Bacon*, 75 N. J. Eq. 401.

"In case of an actual disagreement, he [Kent] adds that the weight of authority is in favor of the power of the majority of the firm, acting in good faith, to bind the minority. And such ought to be the law; for where there is a community of interest, certainly it is the will of the majority, and not the will of the minority, that ought to control. If there is a fraudulent combination on the part of the majority to injure or oppress the minority, the law is otherwise. But in the absence of fraud, certainly it is the majority, and not the minority, that ought to control." *Staples* v. *Sprague*, 75 Me. 458, 460.

The rule applies with added force in the case of a corporation, where there is no such thing as binding action by one individual, but all action is to be taken by the majority. The majority are trustees with not only the power, but also the positive duty, to liquidate the assets. The question is how this can best be done. Upon this question they act in good faith and negotiate a sale which, upon investigation, is found to be for an adequate price. A reasonable price having been obtained in a manner approved by a majority of the beneficiaries, there is no equity in the claim of a dissatisfied minority that the trust should be administered in accordance with their views and against the wishes of the majority.

It was urged at the argument that the finding in the superior court on the question of the adequacy of price did not go so far as to include the fact that the price was fair if measured in the selling price of the Nashua stock. The argument was that while one and one half shares of Nashua stock might be a fair equivalent for one share of Jackson stock, it was not found that $585,000 was a fair

cash price for the net Jackson assets. It was then suggested to counsel that if the assumption in the former opinion that the finding covered both points was erroneous, application might be made to the superior court to limit the finding according to its true intent. Such application has been made, and the presiding justice has not qualified the former statement. This is taken to mean that the construction heretofore put upon it is not contrary to its intended meaning.

But even if it be conceded that there has been no finding of a fair sale at a price fixed in terms of money, still the plaintiffs have failed to make out a case. If there is no finding that the price is adequate, neither is there one that it is inadequate. The sale being one the majority had power to make, and being free from all taint of fraud or irregularity, a court of equity will not interfere unless there be such inadequacy of price as to amount to proof of gross mismanagement. It is not incumbent on the defendants in such a case to prove a sale for full value, for they are not called upon to justify their action. It is for the plaintiffs to show that the defendants have been guilty of a violation of duty.

3. The majority act in a sense as trustees for the minority in the winding up. They hold the property to carry out certain purposes, and in doing this it is well settled that they cannot contract with themselves. And the rule is the same as to contracts with a corporation in which they have a financial interest. But that was not the situation here. As to that part of the transaction whereby the Jackson Company received Nashua Company stock, it is evident that there was no adverse interest. Such interest in the Nashua Company as exists was created by the sale. It was not a preëxisting interest which made it desirable to sell out the Jackson Company for a small price. The only difference in the ultimate situation of the parties was that the majority would hold their Nashua stock, while that of the minority would be sold. There is no possibility of conflicting interest in the agreement with the Nashua Company. It was of equal advantage to every Jackson stockholder to secure as much Nashua stock as possible in exchange for the Jackson assets. Nor does such conflict appear in the sale of the Nashua stock to the American Trust Company, upon the guaranty and presumably for the benefit of Baylies. This sale would not affect the Nashua Company, in which the assenting Jackson stockholders had prospective interests. They would neither gain nor lose by a sale of other Nashua stock, by and to third parties, at a certain price.

The theories of the law governing liquidation, which are advanced in support of the present motion, are not in harmony with the trend of the authorities. The broad proposition, that in the event of the dissolution either of a partnership or a corporation a dissatisfied minority can take from the majority the power to dispose of the assets in any reasonable way, cannot be sustained. Before the control of liquidation is taken from the majority, it must be shown that they have violated their trust; and before a sale negotiated by them can be interfered with, it must appear that it was not a fair sale.

*Rehearing denied.*

All concurred.