CHARLES K. BEIDENKOPF, Appellant, v. DES MOINES LIFE INSURANCE COMPANY, and NATIONAL LIFE INSURANCE COMPANY OF THE UNITED STATES OF AMERICA, Appellees.

Injunction: TEMPORARY WRIT: DISCRETION: REVIEW. The granting 1 or refusal of a temporary injunction is not always a matter of right, even where the petition shows a probable right of relief on final hearing, but is a matter addressed to the sound discretion of the court; and the appellate court will not interfere in such cases with the action of the trial court, unless a clear showing of abuse of its discretion is made.

**Same.** A temporary injunction in its operation is somewhat in the nature of a judgment and execution before trial; and where the parties are in dispute concerning their legal rights it will not ordinarily be granted until the right is established, especially where the claims asserted raise questions of a doubtful or unsettled character.

**Same.** Even though a technical right to relief by injunction is otherwise shown it will be denied, where issuance of the writ may cause inconvenience to the public and serious loss to defendant, while the plaintiff can be readily compensated in damages.

**Same:** -INSURANCE COMPANIES: SALE OF ASSETS. Where the majority of the stockholders of an insurance company, acting fairly and upon reasonable grounds and for substantial business reasons, decide that the interests of all concerned require a sale of all its assets to another company, equity will not interfere by the issuance of a temporary injunction at the suit of a minority stockholder, especially where he has an adequate legal remedy.

**Corporations:** DISSOLUTION: STATUTES. The Code of 1897 authorizes dissolution of corporations prior to the period fixed in the articles, when effected by unanimous consent, or in accordance with the provisions of the articles of incorporation, and is much more liberal in this regard than the similar provision in the Code of 1873.

**Same:** INSURANCE COMPANIES: RE-INSURANCE: CONSOLIDATION. The sale of corporation assets for the purpose of winding up its business is not the equivalent of dissolution, and there is no statute denying such power of sale. And there is no statute requiring unanimous consent of the stockholders of an insurance company to authorize re-insurance of its risks, or consolidation with another company upon observing certain conditions.

**Same:** SALE OF STOCK: FRAUD: PARTIES. A stockholder, who for himself and others similarly situated, is seeking to restrain an insurance company from disposing of its assets and winding up its business, cannot claim that he is representing others whom he claims were fraudulently induced to part with their stock for an inadequate consideration prior to the sale, and who are not themselves objecting to the transaction.

**Same:** FRAUD: EVIDENCE. The mere fact that one person owns the controlling stock in both companies will not render a transfer of all the assets of one company to the other fraudulent *per se*, but is a circumstance bearing upon an issue of fraud which will be carefully inquired into.

**Same:** INJUNCTION: GROUNDS: LACHES: Where a minority stockholder in
an insurance company delayed for three months in bringing his action
to restrain a sale and transfer of the assets of the company, of which
he had notice and during which time the transfer had been substan-
tially carried out, while perhaps not such laches as would defeat
any remedy he may have had for fraud, was sufficient to authorize the
court in refusing a temporary writ restraining the transaction.

*Appeal from Polk District Court,* HON. CHARLES S. BRAD-
SHAW, Judge.

WEDNESDAY, JULY 2, 1913.

ACTION in equity to enjoin the sale and transfer of the
business and property of the Des Moines Life Insurance Com-
pany. Application for issuance of preliminary injunction
denied, and plaintiff appeals. The material facts are stated
in the opinion.—*Affirmed.*

*Louis S. Posner* and *Schenck & Lehmann,* for Appellant.

*Locke & Locke* and *Guernsey, Parker & Miller,* for
Appellees.

WEAVER, C. J.—The Des Moines Life Isurance Company
is an Iowa corporation organized for the transaction of the
business indicated by its title. Prior to October, 1907, it had
been doing business as a mutual concern, but on the day
named it was reorganized into a stock company, and adopted
articles of incorporation appropriate to effectuate the change.
Its capital stock was fixed at $100,000, divided into one thou-
sand shares of the par value of $100 each. Of these shares
Charles E. Rawson and Louise C. Rawson, who were the prin-
cipal figures in the company from the outset, held a numerical
majority. The larger part of the minority stock was owned
by Wilmot A. Harbach, a son-in-law of the Rawsons, and
small holdings were in the hands of various individuals,
among whom were the plaintiff herein and one Max Holtz,

each owning one share. Plaintiff and Holtz were and are residents of New York. The company continued in active prosecution of the life insurance business, quite largely increasing the volume of insurance carried, as well as its showing of assets and profits, until the opening of the year 1912. On January 16, 1912, at the time and place fixed therefor in the articles of incorporation, the stockholders of the company assembled in annual meeting. Of this meeting plaintiff and Holtz were given no notice other than such constructive notice as was imparted· by the provision of the articles naming the day, hour, and place of the annual meeting. That meeting was attended by the holders of nine hundred eighty-three of the one thousand shares of stock issued and outstanding. The· business of the annual meeting not being completed on January 16th, it was adjourned for one week, when the ·transactions took place over which this litigation has arisen. Prior to this date negotiations had been begun by the Rawsons (who for alleged considerations of health wished to retire from the company) looking to the reinsurance of the business of the Des Moines Life Insurance Company in the National Life Company, a corporation of the state of Illinois, and the sale of their shares of stock in ·the Des Moines Life Company to one Johnson, who owned a controlling interest in the National Life.

Referring to this situation, the stockholders at the meeting above mentioned adopted by unanimous vote a resolution as follows:

Resolved by the stockholders of the Des Moines Life Insurance Company in regular annual meeting duly assembled: That the inability of C. E. Rawson and L. C. Rawson, president and vice president respectively of the company, to whose unremitting efforts through a period of more than twenty years its past success has been chiefly due, to continue longer in the active management of its affairs, and the difficulty of securing officers of known experience, ability and integrity to take their places, render it advisable for the

company to reinsure its outstanding liabilities and to retire from business. That the proposition made by National Life Insurance Company of the United States of America to reinsure the company's outstanding liabilities is satisfactory to the stockholders, and that the directors be, and hereby they are, authorized and requested to cause the proper officers of the company in its name and behalf to sign, seal, acknowledge, deliver and carry into effect a contract of reinsurance with said National Life Insurance Company of the United States of America in terms substantially as follows, to wit: [Here follows a copy of the contract with the National Life Company.] That from and after this date, the company transact no business except such as is properly incidental to the carrying out of such contract, and to the fulfillment of its existing obligations, and to the winding up of its affairs. That the directors be, and hereby they are, authorized and requested to take such steps as may be appropriate for the voluntary liquidation of the company's business.

The contract is too voluminous to be here set out. It assigns and transfers to the National Life all the property and assets of every kind and nature owned by the Des Moines Life, and empowers and authorizes the former company to collect and receive all premiums, reserves, and income thereafter becoming due and payable to the Des Moines Life. In consideration of such transfer of all the property and assets of the last-named company the National Life assumed as its own all the policy obligations and other indebtedness of the Des Moines Life except its liability to its stockholders. In addition to the foregoing, and as a further consideration for said sale and transfer, the National Life undertook to pay the Des Moines Life $300,000 cash and the further sum of $400,-000 in five annual payments of $80,000 each. The contract being executed, the cash installment of $300,000 was paid. On January 24, 1912, Harbach, as secretary of the Des Moines Life, addressed letters to the plaintiff and Holtz, informing them of what had been done, and inclosing to each a check for $300 as a "first liquidation dividend." In this letter the reasons for going into liquidation were stated as follows:

"Owing to the continued ill health of Mr. C. E. Rawson, who has been for many years the president and manager of this company, it became necessary either to change the management of the company or to arrange with some other company to perform its obligations. All things considered, it seemed that the latter course was most advantageous to the stockholders and the policy holders alike, provided suitable arrangements could be made with a company of the requisite financial strength and business character." The letter proceeds then to say that the National Life appears to be one of the necessary financial soundness, and the stockholders thus addressed are informed of the essential features of the sale and transfer. On January 30, 1912, plaintiff and Holtz, who appear to be acting together, each addressed a letter to Harbach protesting that they had been given no notice of the meeting or of the proposed sale of the business, expressing their objection thereto, and returning the checks which had been sent to them. No legal proceedings were instituted to prevent the carrying out of said contract until April 23, 1912, when this action was begun.

In his petition, plaintiff sets out the facts above stated, and further alleges that Rawson and his wife were in substantial control of the business of the company under its original organization, and that the change thereof to a stock company was designed to perpetuate such control, and to enhance their personal profits in the business, and that said persons did in fact continue in such management until the date of the attempted liquidation. He further alleges that at the date of such liquidation the company was solvent and in the enjoyment of a large, profitable, and growing business, and owned and possessed property, money, securities, and other assets largely in excess of the securities and reserves which it was required to retain for the benefit of its policy holders, and that in such excess or accumulation of profits plaintiff was entitled to share in just proportion with other stockholders; that in making the sale of said assets and business to the

National Life, and in entering upon a liquidation of its affairs, the said Des Moines Life exceeded its powers, and that the resolution authorizing such sale and the contract made in pursuance thereof are void and of no effect. He further charges that the officers of said company knew that plaintiff and other stockholders would be opposed to such proceedings and would not consent thereto, and that to prevent their opposition being made effective notice of the contemplated meeting and of the proposed sale to the National Life was fraudulently withheld from them until after the contract had been made. It is further charged that the sale of the assets and business of the company is in fact and in legal effect an attempted dissolution of the corporation, and in pursuance of such design its offices have been closed, and it has ceased to do or transact the business for which it was authorized, although under the terms of its organization it has yet many years of corporate life, and its dissolution cannot lawfully be effected except by the unanimous consent of its stockholders. As further illustrating the alleged fraudulent character of the transaction, plaintiff says that after the sale had at least been tentatively negotiated by the Rawsons at a figure making the stock worth at least $700 a share, said Rawsons, aided by Harbach, the secretary, and one Donahey, a director of the company, entered upon an organized effort to purchase the stock held by the minority members at the price of $200 per share, and by falsely representing or concealing the fact and terms of the proposed sale to the National Life did in fact induce many of said stockholders to part with their shares at the grossly inadequate price of $200, and that the shares so obtained were by the purchasers voted in favor of ratifying and carrying out said contract of sale. He further alleges that the officers and directors of the company having had part and share in all said wrongful transactions, application to them to bring this action would be unavailing, and that he as a stockholder is entitled to bring the same in his own name and for himself and for all other stockholders similarly situated.

By amendment to the petition it is charged that at the date of the adjourned stockholders' meeting of January 23, 1912, Johnson had become the actual or beneficial holder of all the stock, except fourteen shares only, of the Des Moines Life Company, and that said Johnson, having thus acquired full control of such company, and having already full control of the National Life Company, was enabled to manipulate and direct the action of both companies in his own interest and fix the terms of the agreement for both parties and to his own personal profit, and that this was done in utter disregard of the rights of the Des Moines Life Company, and especially of its minority stockholders. It is finally charged that the true consideration for the sale to the National Life is not expressed in the contract, but that in addition thereto other large and valuable considerations were paid to the Rawsons and those with whom they were associated in the deal.

Upon the showing thus made plaintiff prays the appointment of a receiver to take charge of the business and property of the Des Moines Life Company, and for a decree declaring the contract for sale and transfer of its assets and business to the National Life Company void and of no effect, and requiring the latter company to restore to the former all the property and assets delivered to or received by it in pursuance of said contract, and further requiring the Des Moines Life Company to use and administer such assets in conformity with the trust imposed upon it by its charter and by law. Plaintiff also asks for the issuance of a temporary injunction pending the final termination of the action, restraining the Des Moines Life Company and its officers from making any further delivery or transfer of its property and assets to the National Life Company, and restraining said last-named company from further receiving such property and assets, and from disposing of any property or assets received from the Des Moines Life Company until the rights of the parties have been finally adjudicated.

Answering the petition, the defendants admit the sale

and transfer of the assets and business of the Des Moines Life Company to the National Life Company, but deny all allegations of wrong and fraud in such transaction, and deny that they acted therein in excess of their lawful power and authority. They aver that of the 1000 shares of capital stock of the Des Moines Life Company 998 shares were held by persons expressly consenting to such sale, and that all of said 998 shares have been transferred to and are now owned and held by Johnson, who is their sole owner. They further allege that while the Des Moines Life had done a profitable business up to the date when liquidation was determined upon, yet by reason of the fact that Rawson and his wife, to whose efforts and business capacity such prosperity had been largely due, were compelled to retire from the company because of failing health, and by reason of the peculiar conditions then obtaining in the business of life insurance, rendering the same likely in the immediate future to be more hazardous and less profitable, it appeared both expedient and wise to accept an advantageous offer for the reinsurance of its risks and the sale of its assets, rather than to continue the business under less favorable conditions than had theretofore attended it. Under such circumstances, and acting in good faith for the benefit of all concerned, they say they entered into the contract. They further represent that, beginning immediately after the making of said contract, they began the performance of its stipulations, and long before the institution of this action all the assets of the Des Moines Life (other than the price received for said sale) were transferred and turned over to the National Life, and the installment of $300,000, paid to the former company upon said contract, was distributed and paid out to its stockholders as a liquidation dividend. Prior to the beginning of this suit, defendants further say, more than ten thousand of the policy holders of the Des Moines Life Company had acquiesced in the contract of reinsurance, and executed their written consent to substitute the contract of the National Life for that of the Des Moines Life,

thereby releasing the latter from such policy obligations, and that under the obligations so assumed by the National Life the latter has become liable to pay and has paid death claims to the amount of $94,000. Thousands of policy holders have paid to the National Life the premiums falling due upon the insurance issued by the Des Moines Life, and it is averred that the court ought not and cannot make any order or enter any judgment herein affecting the rights of the policy holders, none of whom are parties to this proceeding.

The pleadings—petition and answer—with various affidavits, counter affidavits and exhibits, of which more specific mention is not necessary, were submitted to the court upon plaintiff's application for temporary injunction. The writ was denied by the court in a brief opinion, stating, in effect, that the demand for an injunction having been delayed some three months after the contract complained of had been made, and such contract having already been largely performed a temporary injunction might at that stage of the proceedings be productive of harm rather than benefit to the policy holders and to others interested in the controversy. It is from this order that appeal has been taken. No trial has been had upon the merits of the dispute, and the question before us is to be disposed of upon the petition and answer and the supporting documents to which we have referred.

The foregoing statement is perhaps of tedious length, but it has seemed necessary to a fair understanding of the position of the parties to a controversy which, however small the sum immediately involved in its determination, affects directly or indirectly interests of great importance.

I.     Counsel on either side have favored the court with carefully prepared briefs, discussing with great thoroughness the legal questions they believe raised by the appeal.

1. INJUNCTION: temporary writ: discretion: review.

Some of these we think unnecessarily anticipate or assume the merits of the litigation as they may appear on the trial yet to be had. The granting or refusal of the demand for a temporary

injunction is not always a matter of right, even where the petition shows probable right of relief on final hearing. Application therefor is addressed to the sound discretion of the court, to be guided according to the circumstances of the particular case. High on Injunction (4th Ed.) section 11.

It is of course familiar doctrine that this court will not interfere in such cases except upon clear showing of abuse of the discretion so reposed in the court below.

The writ is to a great extent a preventive remedy; and where the parties are in dispute concerning their legal rights, it will not ordinarily be granted until the right is established, especially if the legal or equitable claims asserted raise questions of a doubtful or unsettled character. 2. SAME. Says the Pennsylvania court: "As a preliminary injunction is in its operation somewhat like judgment and execution before trial, it is only to be resorted to from a pressing necessity to avoid injurious consequences, which cannot be repaired under any standard of compensation." *Mammoth Coal Co.'s Appeal*, 54 Pa. 183.

On the same subject Balwin, J., in *Bonaparte v. R. R. Co., Baldw.* 205, Fed. Cas. No. 1,617, uses this language: "There is no power the exercise of which is more delicate, which requires a greater caution, deliberation, and sound discretion, or more dangerous in a doubtful case, than the issuing of an injunction; it is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages." So, also in *Thompson, Attorney General, v. City*, 9 N. J. Eq. 624, in affirming the refusal of a temporary writ, it is said that "in the bill, answer, and affidavits, no case of threatening, irreparable mischief is made out. That is the only question he (the chancellor) had to decide upon the motion for a preliminary injunction, in advance of the hearing of the cause, and before the case was in a situation to be decided upon the merits. Where it does not appear that irreparable mischief is liable to ensue from

leaving a party to go on exercising a right he claims, the court never stops him before it has an opportunity of examining the question of right.'' In the same line is the declaration of the same court: ''An injunction will not issue where the right of the complainant, which it is designed to protect, depends upon a disputed question of law about which there may be doubts, which has not been settled by the . . . law of this state.''. *Stevens v. R. R. Co.*, 20 N. J. Eq. 126.

Even where the technical right to injunctive relief is otherwise clearly established, it will be denied where the issuance of the writ may occasion inconvenience to the public and serious loss to the defendant, while the injury to the plaintiff can readily be compensated in damages. *Becker v. R. R. Co.*, 188 Pa. 484 (41 Atl. 612); *Fisk v. Hartford*, 70 Conn. 720 (40 Atl. 906, 66 Am. St. Rep. 147).

3. SAME.

We have cited but few of the many precedents upon this question, but they establish we think the general trend of judicial opinion and indicate the conservative and safe rule to be observed in cases of this character. Applying that rule to the case made by the record before us, we hold that it shows no abuse of discretion by the trial court justifying us in reversing its ruling and requiring it to sustain the plaintiff's demand for a temporary injunction.

II. Strictly speaking, the conclusion announced in the preceding paragraph is as far as it is necessary for us to go in disposing of the plaintiff's appeal from the ruling on his motion for a temporary writ. But the manner in which the case has been presented and argued evidences a common desire of counsel on both sides that we express our views on some of the more fundamental propositions underlying the principal controversy. Within limits this may be proper and serve to keep the future course of the litigation within due bounds. These views will also have quite direct bearing upon the

4. SAME: insurance companies: sale of assets.

correctness of the position taken by the trial court in re-fusing the writ.

The basic contention of the plaintiff is that the sale of the business and assets of the Des Moines Life Company is in law and equity tantamount to a dissolution of that cor-poration, and that the dissolution of a corporation, before the expiration of its charter period cannot be legally effected, or the business for which it was organized abandoned, except by the unanimous consent of all its stockholders. It is to be admitted that this rule, stated in a general way, has the support of numerous authorities, most of which are collected in appellant's brief. The leading and most frequently cited decision to this effect is *Abbott v. American Hard Rubber Co.*, 33 Barb. (N. Y.) 578. It is perhaps open to fair doubt whether the question was necessarily involved in that case, but it has undoubtedly been treated as an authority, and not infrequently followed. See *Forrester v. B. & M. Co.*, 21 Mont. 544 (55 Pac. 229, 353) ; *People v. Ballard*, 134 N. Y. 269 (32 N. E. 54, 17 L. R. A. 737) ; 4 Thompson's Corp. (2d Ed.) section 4489, and cases there cited.

But the doctrine has by no means the unanimous support of the precedents, and it has frequently been held that its strict enforcement would neutralize the efficiency of that other and necessary rule to which every stockholder impliedly agrees in becoming a member of a corporation, that the man-agement and control of the corporate business and interest shall be vested in the majority. See *Treadwell v. Mfg. Co.*, 7 Gray (Mass.) 393 (66 Am. Dec. 490) ; *Bowditch v. Jackson*, 76 N. H. 357 (82 Atl. 1014, Ann. Cas. 1913-A, 366) ; *Lauman v. R. R. Co.*, 30 Pa. 42 (72 Am. Dec. 685) ; *Ritchie v. Mining Co.*, 1 Ont. L. R. 654; *Arents v. Tobacco Co.*, (C. C.) 101 Fed. 338; *Maben v. C. & C. Co.*, 173 Ala. 259 (55 South. 607, 35 L. R. A. [N. S.] 396).

The rule of the *Abbott* case has been mentioned *arguendo* by this court as affording a general standard by which cor-porate powers are restricted. *Traer v. Prospecting Co.*, 124

Iowa, 112. But while frequently called upon to hold invalid the sale of all the property of a corporation, we have never applied or enforced the rule relied upon by the appellant. Looking to our decisions having any legitimate bearing upon the issues now presented, we find fairly sustained the proposition that, when the majority of the stockholders of a business corporation, acting without fraud and upon reasonable grounds, conclude that the exigencies of the business in which it is engaged and the best interests of all concerned therein require a sale of the property and a liquidation of the corporate affairs, equity will not interfere to prevent the consummation of such transaction at the suit of one or more minority stockholders, especially where it appears that the protesting members are not likely to suffer any injury for which there is no other adequate remedy. For example, while stating the general rule of the *Abbott* case, it has been held that when insolvent or in a failing condition the corporation may sell all its property without the unanimous consent of its stockholders. *Traer v. Prospecting Co.*, 124 Iowa, 112.

Where a minority stockholder was given no notice of a meeting at which a sale of the corporate assets was authorized (it being known to the majority that he was opposed to the transaction), the sale was held to be valid; it appearing that the financial condition of the corporation made it advisable, and no fraud being disclosed. *Sawyer v. Printing Co.*, 77 Iowa, 242.

The same question arose in *Price v. Holcomb*, 89 Iowa, 135, and it was there said:

It is unquestionably true that a private corporation holds its property as a trust fund for the stockholders. . . . and that when the stockholders act together they are in a sense the corporation, and must act with due regard to the right of the minority. If the majority decide arbitrarily, and without just cause, to sell the property of the corporation to the prejudice of the minority, and thereby compel the winding up of the business, . . . it is a fraud upon the minority, and courts of

equity will interfere. If, however, just cause exists for selling the property, as where the corporation is insolvent and the sale is necessary to pay debts, or where  .  .  .    the business is a failure  .  .  .    and the best interests of all require it, the majority have clearly power to order the sale, and in such case their acts are not *ultra vires*.

While the cases here cited present instances of sales made under conditions of financial embarrassment, it is nowhere held that insolvency and financial stress afford the only occasion for the exercise of such power. Indeed the rule as stated in *Price v. Holcomb, supra,* fairly implies that such power may be exercised where any "just cause" exists therefor. In *Platner v. Kirby,* 138 Iowa, 265, this court appears to have interpreted the effect of its former holdings in harmony with that view, saying that "in this state we have recognized the right of the majority to determine whether the corporation shall be continued or wound up." This position finds support in precedents from other states already cited.

Speaking of the stockholders of a business corporation, Judge Bigelow of the Massachusetts court has said, "By accepting a charter they do not undertake to carry on the business for which they are incorporated indefinitely, and without any regard to the condition of their corporate property. Public policy does not require them to go on at a loss. On the contrary it would seem very clearly for the public welfare, as well as for the interest of the stockholders, that they should cease to transact business as soon as, in the exercise of a sound judgment, it is found that it cannot be prudently continued. If this be not so, we do not see that any limit could be put to the business of a trading corporation, short of the entire loss or destruction of the corporate property. The stockholders could be compelled to carry it on until it came to actual insolvency. Such a doctrine is without any support in reason or authority." In that case the corporation was not insolvent, but the conditions were

such that means to go forward properly with the business were not available. Of the power of the majority under these circumstances the court further says: "We entertain no doubt of the right of a corporation, established solely for trading and manufacturing purposes, by a vote of the majority of their stockholders, to wind up their affairs and close their business, if in the exercise of a sound discretion they deem it expedient so to do. At common law the right of corporations, acting by a majority of their stockholders, to sell their property is absolute, and is not limited as to objects, circumstances or quantity."

The same line of reasoning is followed in the recent case of *Bowditch v. Jackson,* 76 N. H. 351 (82 Atl. 1014, Ann. Cas. 1913-A, 366). The court there says, after reference to the various statements of the rule by which a corporation under proper circumstances may sell all its property:

All these are fairly summed up in the statement that the majority may close out the affairs of the company when it can no longer make a reasonable profit. It is believed no court would now hold that the rights of the minority were more extensive than this rule implies. If the majority may sell to prevent greater losses, why may they not also sell to make greater grains? Bearing in mind that this is purely a business proposition, with no public rights or duties involved, there seems to be no substantial difference between the two cases, as a matter of principle. In each case the sale is made because it is of advantage to the stockholders. Whether the profit to be made is a reasonable one must be a relative matter. (Further discussing the subject the court adds:) And the question is one of future prospects. Its decision requires the exercise of business judgment, sagacity, and power to forecast coming events. It is not an issue appropriate for trial and decision in courts, but rather one to be settled by the judgment of the men conducting the business in question. In a limited sense, the majority act as trustees for all the stockholders. When their acts are impugned by the minority, it is not the function of the court to set its judgment against theirs in settling the wisdom or policy of proposed action. By

the contract of association all questions of this nature were committed to the majority for final decision (citations omitted.)

A brief reference to the text-writers upon this question may also be of interest.

Mr. Thompson, after quoting a judicial holding that a corporation must remain in business unless all stockholders consent to its being wound up, expresses his own views as follows:

But it is believed that this *dictum* is unfounded when applied to a case where a majority of the stockholders elect to wind up the affairs of the corporation and distribute its assets, because, although the affairs of the corporation may at the particular time be prosperous, yet circumstances may exist rendering it probable that this prosperity will not continue; and whether such circumstances do exist, or are likely to supervene, is a question committed exclusively to the judgment of the majority. It is believed that no case can be found in which a court of equity has granted an injunction, at the suit of a minority stockholder against the majority, to prevent them from discontinuing the business of the corporation and winding up its affairs. The exercise of such a power would be most extraordinary. It would be tantamount to compelling the specific performance of an agreement to form and carry on a corporation extending over an indefinite period of time, and when, in the judgment of the majority, on a question of mere economy and propriety, on which their judgment ought to be conclusive, it has been found more expedient to discontinue the business. (Thompson on Corporations, vol. 4, section 4443.)

To the same effect it is said by Mr. Morawetz:

Ordinary trading corporations are formed solely for the pecuniary benefit of their shareholders. It is therefore no more than reasonable that the majority of an association of this description should have a discretionary power to give up the joint speculation, and wind up the company's business, whenever they deem this step to be in the interest of the

whole association. The law is settled accordingly; and it may be stated as a rule that it is an implied condition in the charter of every corporation, formed solely for the pecuniary profit of its shareholders, such as an ordinary trading or manufacturing corporation, that its business may be wound up whenever the majority deem this to be expedient. Under these circumstances the majority may, without the consent of the minority, sell the whole of the company's property, close up the business, distribute the assets, and surrender the charter to the state. (1 Morawetzon Corp., section 413.)

And it seems to us that when appellant concedes, as he does in argument, that the majority may sell and dispose of the corporate property and assets when the necessities of business require it, they recognize a departure from the strict rule in the *Abbott* case, the effect of which goes distinctly beyond the limits which he asks us to lay down for the government of the present case. We have no statute which directly or by necessary implication defines the line between a valid and invalid exercise of this power. If we look to the reasons which have led the court to say that a single stockholder, who has contributed perhaps a thousandth part of the capital fund, shall not be authorized to compel the owners of the other nine hundred and ninety-nine shares to perpetuate the business of an insolvent corporation, they just as imperatively require that even a solvent corporation may be liquidated and closed out if those to whom the management of that business is committed foresee, or honestly believe they foresee, threatened perils which sound business wisdom warns them to avoid by disposing of the corporate assets and winding up its affairs. The business man who does not consult the future and lay out his course with reference to what he there discovers finds himself sooner or later involved in financial ruin. Nor can we suppose that a corporation for pecuniary profit is looking for that kind of blind leadership. If it be wise and just to say that a corporation may dispose of its assets when overcome by disasters, it is even more wise and just to say that they may do like-

wise to prevent disaster and preserve a solvency the permanence of which changed conditions have rendered insecure.

The defendants herein allege that by the retirement of the persons whose skill and industry had built up the business of the Des Moines Life, and by reason of radical changes which had taken place in the field of life insurance, rendering the business more hazardous and less profitable they were persuaded that it was for the benefit of all concerned to withdraw from the competition and take advantage of an opportunity to sell at a·figure which insured to each and every stockholder the full return of his investment with large added profits. And if this be true, and the majority saw or had reason to believe that while the business had theretofore been profitable, it had reached the high tide of its prosperity, and was quite sure to enter upon an era of declining profits and decreasing assets, which might lead the corporation to the verge of insolvency, then sound business policy and the due concern for the preservation of the trust imposed upon the corporation would appear to dictate a sale and transfer of the concern while it was in the condition to command the highest possible price. To say the least, there is no rule of equity to which we have ever given our adherence which requires a court to interfere by injunction to defeat a sale so made in good faith and for an adequate consideration. Whether these conditions did exist in this company, and whether the majority had any reason to anticipate changes rendering a sale of the assets and a winding up of the corporate affairs advisable as a sound business proposition, we do not now stop to inquire. The defendants assert that such conditions did exist, and that the sale was made in good faith toward all stockholders. The plaintiff denies the plea thus made, and charges that the majority action was tainted with bad faith. The truth of this issue is yet to be tried, and we ought not to express any opinion upon controverted facts.

Before leaving this branch of the case we may say that the Code of 1897 introduced a significant change in the language of the statute referring to the dissolution of corporations. In the code of 1873, section 1066, it was provided that "No corporation can be dissolved prior to the period fixed in its articles of incorporation, except by unanimous consent, unless a different rule has been adopted in their articles." As re-enacted into the present Code, section 1617, the provision is that "A corporation may be dissolved prior to the period fixed in the articles of incorporation by unanimous consent or in accordance with the provisions of its articles"—a regulation far less sweeping in its terms than the one for which it has been substituted.

*5. CORPORATIONS: dissolution: statutes.*

But the question presented in this appeal is not one of the limitation of the power to dissolve the corporation, but one of power to sell the assets of the corporation and wind up the business. That such sale is not necessarily equivalent to a dissolution has been determined by us. *Price v. Holcomb,* 89 Iowa, 123. As we have already noted, there is no statute denying such power of sale. There is a statute permitting a life insurance company to reinsure its risks, or to consolidate with another company by observing certain conditions. Code Supp. 1821-n, *et seq.* Among these conditions is none requiring the unanimous consent of the stockholders.

*6. SAME: insurance companies: re-insurance: consolidation.*

III. Concerning the alleged fraud and misrepresentation by which it is alleged that certain of the minority stockholders were induced to part with their holdings at $200 per share, it is possible that upon that final hearing such acts, if proved, may tend to establish a general scheme to defraud, in which the sale of the assets of the company played a part, but, so far as is developed by the pleadings, it is not clear what relevancy such matter has to the plaintiff's claim in this proceeding. None of the persons so parting with their stock are in court

*7. SAME: sale of stock: fraud: parties.*

demanding redress, nor does the plaintiff appear to be authorized to represent them. So far as the record discloses, they are satisfied with the consideration paid them, and do not care to risk its loss or diminution by litigation. Neither plaintiff nor Holtz were so misled; they refused the offer, and have suffered no loss or damage because of that fraud. They constitute á class by themselves, and the claim of plaintiff to represent others "similarly situated" with himself would seem to affect the rights of no other stockholder except perhaps those which may be asserted by Holtz.

IV. Of the claim that, Johnson being the holder of a majority of the stock of the National Life, and having made more or less complete arrangements for the purchase of the

8. SAME: fraud: evidence.

Rawson stock in the Des Moines Life, he stood in such a relation of trust to both companies that a sale negotiated by him of the assets of one to the other is *per se*, or at least presumably, fraudulent, it is sufficient to say (without going into an examination at this time of the argument and authorities presented in support of the point thus made) that as at present advised we think the fact that the control of both companies was actually or potentially in the hands of Johnson would not make the transaction *per se* fraudulent or void. If the fact be established, it is of course a material circumstance, and the court will scrutinize a deal so accomplished with care; and, if fraud in fact be found, will take proper steps to protect the interests of those injuriously affected thereby.

V. Believing that the ruling of the trial court may be sustained upon other and perhaps more vital principles, we have not entered upon any consideration of the question of

9. SAME: injunction: grounds: laches.

plaintiff's laches, which that court deemed sufficient ground for denying a preliminary injunction. That view is, however, not without merit. While there was probably no such laches as leaves the plaintiff remediless, if he has been wronged as he alleges, yet he is not in a position to justly complain if it be said to

him that he has waited so long the court will not listen with favor to his demand for the extraordinary aid of a temporary injunction. It is clear from his own showing that he knew a sale of the assets was in contemplation of those having a controlling interest; and, while he was living at a distance, and did not attend the meeting, he was promptly notified of its action, and of the contract which had been made—a contract which called for immediate delivery of the company's property and assets—yet he waited three months till, as it is alleged, the terms of the agreement had been substantially complied with and carried out, and then asked to have the writ issue. Even if otherwise the court should have granted the writ, we think it was not reversible error to deny it under these circumstances.

Other matters argued by counsel it is not necessary to discuss at this preliminary stage of the case, and we shall pass them without further mention.

For the reasons stated, the ruling of the trial court denying plaintiff's prayer for a preliminary injunction is *Affirmed.*