# AMERICAN ELEMENTARY ELECTRIC COMPANY *v.* NORMANDY.

---

EQUITY; CORPORATIONS; NAMES; STOCKHOLDERS; APPEAL AND ERROR; RECEIVERS; DISCRETION.

1, In the hearing of an equity cause on bill and answer, the evidential

value of the answer, which was under oath, was adverted to in view of the vague and indefinite statements in certain respects of the bill.

2. A corporation may not be organized in this District for more than one object (citing *Dancy* v. *Clark*, 24 App. D. C. 487), and where its certificate expresses no *primary* object and no such object is deducible from the language used in the certificate, but the certificate expresses a large number of objects, the charter is voidable.

3. A corporation has no power, unless authorized by law, to change its name, and it would seem that an unauthorized change of name is an abandonment, not only of the corporate name, but of the corporation itself.

4. Sections 1298–1300, D. C. Code (31 Stat. at L. 1394, chap. 854), permitting any person who is a resident of the District of Columbia to change his name by petition in equity, do not apply to corporations, although by the third section of the act of Congress of March 3, 1901, to establish a code of law for the District of Columbia, it is provided that the word "person" shall apply to corporations "unless such construction is unreasonable."

5. A minority of the stockholders of a corporation cannot hold a majority to an unprofitable and hopeless enterprise, and because all of the stockholders of a corporation have not consented to the transfer of its assets to another corporation, it does not follow that the transfer will be set aside in equity regardless of the consequences.

6. The exercise by the equity court of its discretion in the appointment of receivers ·*pendente lite* is reviewable on appeal. (Citing *Billings* v. *Field*, 36 App. D. C. 16.)

7. A bill in equity by the minority stockholders of a District of Columbia corporation to vacate a transfer of its assets to a foreign corporation, which had been made without the consent of the plaintiffs, and for the appointment of a receiver *pendente lite*, was *held* not to be maintainable on a hearing on bill and answer, where it appeared by the pleadings that the directors of the local corporation, having been advised by counsel that its charter was voidable; that a change of its name which it had attempted to effect was of doubtful validity; that its proposed action in acquiring the stock of other and subsidiary companies would violate the laws of this District; and that if the objects for which it was organized, which were the manufacture and sale of a patented electric primary battery through subsidiary companies to be organized throughout the country, were to be continued as planned, a new corporation should be organized in another jurisdiction to carry out such objects,—called a stockholders' meeting, after due notice, at which all but 658 of its 200,000 shares were represented, and at which was authorized the transfer

of all of its assets to the new corporation which had been organized, and which assumed the debts of the old corporation and agreed to carry out the enterprise; that thereafter there was an exchange of stock by the two corporations; whose capital stock was the same, which left unexchanged and outstanding 260 shares of the stock of the old corporation, of which the plaintiffs held 72 and those verifying the bill held 24; that at the time the bill was filed the new company was endeavoring to manufacture and sell the battery in question, and that to grant the relief asked would be destructive of the entire enterprise.

No. 2989.   Submitted February 6, 1917.   Decided April 23, 1917.

HEARING on an appeal by the defendants from a decree of the Supreme Court of the District of Columbia appointing a receiver *pendente lite* for a corporation.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This is a minority stockholders' bill in the supreme court of the District, and the appeal is from a decree in that court appointing a receiver *pendente lite.*

The hearing was upon bill and answer, the answer being under oath.   A better understanding of the very general averments of the bill will be possible if we first state the antecedent conditions as disclosed in the answer.

The defendant George S. Engle is the alleged inventor of an electrical battery, known as the Engle Primary Battery.   As a means of exploiting his invention he adopted the usual instrumentality of a body corporate, and, finding in existence, in supposed compliance with the laws of the District of Columbia, a corporation by name the "American Dynelectron Company," incorporated November 30, 1904, he acquired control of the same.   Subsequently, by petition supposed to be authorized by the provisions of secs. 1298 to 1300 of the Code [31 Stat. at L. 1394, chap. 854], he procured the name of the company to be changed to "American Elementary Electric Company," one of the defendants, and hereinafter called the District Company.   In the certificate of incorporation of the Dynelectron

Company, the objects of its organization are stated to be as
follows: "For the purpose of conducting a general manufactur-
ing business in all details, anywhere in the world.   Manufac-
turing, buying, selling, and dealing—any and all kinds of goods,
wares, and merchandise, including dynelectrons, all kinds of
power, heating, and illuminating plants.   Issue and transfer
all notes, bonds, and other evidence of indebtedness, contracts,
franchise, patent, patent rights, trademarks, privilege, and etc.,
and in connection with the above to engage in any line of busi-
ness necessary or convenient for the best interests of the com-
pany, not inconsistent with the law, acquiring or disposing of
the necessary real estate and to have all other rights, powers,
and privileges conferred by the laws upon corporation."

The amount of capital stock of the original company was
fixed by its certificate of incorporation at $25,000,000 divided
into 250,000 shares of the par value of $100 each.   Engle
assigned and made over to the company his invention, in con-
sideration of the issue to him of its capital stock, of which he
placed in the treasury of the company 50,000 shares, of the par
value of $5,000,000, retaining as his own the remaining 250,000
shares of the par value of $20,000,000.   He was elected and
became president, general manager, and executive officer of the
company.

Thereafter the District Company and Engle conceived and
undertook to put into execution a general plan of organizing
throughout the several States of the United States local sub-
sidiary corporations.   In pursuance of this plan "State option
contracts," so-called, were prepared, under the provisions of
which the promoters of the organization of the subsidiary or
State corporations, upon the purchase at par of certain shares
of stock of the parent company, *of the holdings of Engle,* and
the actual organization of the said several subsidiary corpora-
tions and the purchase at par of certain shares of stock therein,
were to receive by way of bonus in remuneration of their par-
ticipation, investment, and promotion services, certain additional
shares of stock of the subsidiary or State corporations, it being
the intent and purpose to keep the shares of stock in the parent

company in its treasury intact, until the enterprise should have been placed upon a sound basis, Engle undertaking in the meantime to pay out of the money received by him for his individual stock all necessary expenses. This plan involved and required the delivery to the parent company of a certain proportion of the stock of each of the said subsidiary or State corporations, with the right of the parent company to be represented temporarily in the management of each of said subsidiary corporations.

As might have been foreseen, it was not long before trouble arose. Thereupon counsel were consulted, and they advised that the act of incorporation was at least voidable, and that the change of name of the company was of doubtful validity and, further, that under the laws relating to corporations in the District it would be unlawful and impossible to carry out the plan for the organization of subsidiary companies, as the District laws did not permit a local corporation to hold stock in another corporation or to become a holding company. Counsel advised the District Company and Engle that, if the operations of the District Company were to be continued as planned, there should be organized under the laws of some other jurisdiction a new and independent corporation, about whose powers and privileges there could be no doubt, and into which as its successor in law and in fact the District Company could in effect be transmuted.

Acting upon such advice, the directors of the District Company issued to all its stockholders notice of a meeting to be held for the purpose indicated. A call for this meeting fully and explicitly set forth its reasons and necessity, and informed each stockholder of the company of the proposed proceeding and the details of its carrying out; that is to say, that a new company of the same name should be organized in some other jurisdiction with the same capitalization as the District Company; that the stockholders of the District Company should exchange their stock for that of the new company; that all assets and stock of the District Company should be sold, transferred, and conveyed by the District Company to the new company *upon condition of the assumption by the latter of all the obligations of the former;*

that the District Company should cease to be a going concern, and that all of its operations, present and prospective, should be carried on by the new company as its successor.

Of the 200,000 shares of the District Company outstanding, 199,146 were represented at the ensuing stockholders' meeting, and 196 by proxy, leaving unrepresented 658 shares of the entire 200,000 outstanding. The resolutions set forth in the notice of the meeting were adopted by a vote of 199,337 shares, the holder of but one share voting in the negative and four shares not voting. Subsequently the holders of 199,739½ shares surrendered their stock for cancelation and took in exchange shares of the new company, in equivalent amounts, leaving outstanding and unexchanged 260½ shares out of an outstanding 200,000 shares. In consideration of the undertaking by the defendant Arizona Company to carry out the enterprise and objects for which the District Company really was organized, the latter company conveyed and made over to the former all of its assets, and the answer alleges that at the time of the filing of the bill herein the Arizona Company was endeavoring to produce, manufacture, and place upon the market the Engle battery. It further appears from the answer that the aggregate of the holdings of the fifty-four plaintiffs in the District Company is 72½ shares and in the Arizona Company 8 shares, of the total 200,000 shares outstanding, and that the nine actual subscribers to the bill together hold twenty-four shares of stock of the District Company and one share of the Arizona Company.

The averments of the bill, much condensed and stated in narrative form, are substantially as follows: Plaintiffs are owners of *"a large portion"* of the capital stock and securities of the District Company, and they, together with others similarly situated, but not parties to the bill, paid Engle as general manager and sole executive committee about $26,000. Engle's holdings of stock were fraudulent and void because issued and delivered to him upon alleged false statements and misrepresentations regarding said battery. After having himself elected the general manager and executive committee he exercised absolute control of the affairs and policies of the company, including the issuance

of State option contracts, series A and B, characterized by the bill as "securities." As general manager and sole executive committee he sold to plaintiffs and many other persons said securities to an amount approximating more than $65,000, which he received in cash, according to the best knowledge, information, and belief of plaintiffs, who upon information and belief aver that he has appropriated to himself or secreted substantially all of said amount, and has failed and refused to account therefor to the company or to the plaintiffs as the owners of securities thereof. Such alleged misappropriation was made by Engle "under the specious, false, and fraudulent contention, that said funds belong to him personally, and not to said corporation, his contention being that said funds were received as purchase money for his private stock in said corporation."

After the District Company was incorporated Engle, as its general manager, etc., undertook in a most ineffectual, reckless, and fraudulent manner to carry out some of the objects of the company, but in October of 1914 that company, under his control and direction, and in derogation of the vested rights of the plaintiffs and others similarly situated, attempted to put out of existence the District Company by abandonment of its charter and charter rights. The transfer to the Arizona Company was without consideration, and that company is financially irresponsible and possessed of no property or assets other than those attempted to be conveyed to it by the District Company. Plaintiffs aver that if the Arizona Company is permitted to continue in possession of the properties, assets, and franchises of the District Company, the vested rights of plaintiffs will be entirely dissipated, to their irreparable damage and loss. A number of plaintiffs have been denied admission to the stockholder's meetings of the Arizona Company and have been denied all information with reference to its plans and policies. They have never realized or been paid anything on account of their securities of the District Company from the proceeds of the alleged sale of all of its assets to the Arizona Company, nor have they been offered any State option contracts of the latter company or anything else of value for their securities in the District

Company. The pretended sale and transfer of the assets of the District Company to the Arizona Company was without the consent or privity of the plaintiffs, and against their wishes, and a fraud upon their rights as owners of the securities and stock of the District Company. Engle has taken, or attempted to take, substantially the same amount of capital stock of the Arizona Company as he had in the District Company, and through his majority stock dominates and controls the latter company. Reference is made to certain independent litigation which, however, we deem of no materiality here. The bill concludes that by reason of such alleged mismanagement by Engle plaintiffs are apprehensive that the properties, rights, and franchises of said company will be dissipated and destroyed, to the injury of its creditors, if any, as well as of plaintiffs and other owners and holders of stock and securities of the company, unless the court take immediate possession and control of the company by receiver.

The bill prays for process, discovery, and vacation of the conveyance from the District Company to the Arizona Company and any and all transactions which may have taken place between them; for the appointment of a receiver to take charge of, collect, and manage the property, and to carry on and administer the business, affairs, properties, assets, and credits sold and conveyed, or attempted to be sold and conveyed, by the District Company to the Arizona Company, pending the final disposition of the case; and that all proper accounts may be taken between the plaintiffs and defendants generally and severally, and for general relief.

*Mr. Henry E. Davis* and *Mr. Alvin L. Newmyer,* for the appellants, in their brief cited:

*Beidenkopf* v. *Insurance Co.* 160 Iowa, 629; Clark & M. Priv. Corp. 160 (A); D. C. Code, Secs. 633–639, 1298; Cook, Corp. 6th ed. Sec. 670; *Phillips* v. *Providence Steam Engine Co.* 21 R. I. 302; *Post* v. *Beacon Vacuum Pump Co.* 84 Fed. 371; *Tanner* v. *Lindell R. Co.* 180 Mo. 1; Thomp. Corp. 2d ed. Sec. 2424; *Treadwell* v. *Salisbury Mfg. Co.* 7 Gray, 393.

*Mr. James W. McNeill,* for the appellees:

1. Unless the facts presented by this appeal clearly satisfy this court that the lower court committed an abuse of sound discretion, then only will this court interfere with the interlocutory order appointing a receiver *pendente lite.* *Wood* v. *Grayson,* 16 App. D. C. 185. The court properly exercised its discretion. *Sage* v. *Memphis, etc., R. R. Co.* 125 U. S. 361, 375; *Grant* v. *Phœnix Ins. Co.* 121 U. S. 105, 117; *Countze* v. *Omaha Hotel Co.* 107 U. S. 378, 395; *Clark* v. *Bradley Co.* 6 App. D. C. 444.

2. The validity or invalidity of the sale of all the assets of the local corporation to the Arizona Corporation, for the stock of the Arizona Corporation, is not involved and cannot properly be considered on this appeal, because that question can only be correctly and justly determined upon a hearing of the merits of the case and upon an appeal prosecuted from a final decree in the case, and for the further reason that the interlocutory order appealed from does not set aside said sale either expressly or by implication, but simply and only provides for the appointment of a receiver *pendente lite* to preserve and protect the property pending the litigation. But if the court should hold otherwise, then it is submitted that the sale complained of was clearly an act *ultra vires* of the majority of the stockholders of the District Company and a fraud upon and a breach of the vested rights of the plaintiffs as owners of the stock and State option contracts of the old company. 3 Cook, Corp. 7th ed. Sections 670 and 671, pp. 2163–2194.

3. As this is an appeal from an interlocutory order appointing a receiver *pendente lite,* passed within the sound discretion of the lower court for the protection of the property pending litigation, the same should not be considered by this court, but should be dismissed because the appellants were not allowed a special appeal from said order, and further because no special reasons appear why said appeal should be considered. *Parish* v. *Hedges,* 34 App. D. C. 21; *Healey* v. *Maroney,* 34 App. D. C. 99.

Mr. Justice Robb delivered the opinion of the Court:

The fact stands forth that the only possibility for a realization of any of the hopes of the stockholders of the defendant company lies in the successful exploitation of the Engle invention, and, for reasons which we shall state later, it is clear to us that to grant the relief prayed by this bill would be destructive of the enterprise. We make these general observations now to emphasize the necessity for a clear and unequivocal statement of facts relied upon by the plaintiffs before such a result will be made possible by the court. And where, as here, such statement is vague and indefinite, and the answer is specific and under oath, the evidential value of that answer must be kept in mind. *Vigel* v. *Hopp,* 104 U. S. 441, 26 L. ed. 765; *Campbell* v. *Northwest Eckington Improv. Co.* 229 U. S. 561, 574, 57 L. ed. 1330, 1336, 33 Sup. Ct. Rep. 796.

Turning now to the bill, we find that plaintiffs are not owners of a "large portion" of the capital stock of the District Company, but, on the contrary, are the holders of an almost infinitesimal number of shares. Of course, the holder of but one share is entitled to full protection of his rights, but such an extravagant statement at the outset of a bill does not tend to increase the confidence of the court in the exactness of subsequent statements.

The next averment is to the effect that Engle's holdings of stock were fraudulent and void because issued to him upon alleged false statements and misrepresentations regarding his invention. But plaintiffs' holdings are of those very shares, and it is not even averred that purchase thereof was induced by any misrepresentations. It must be assumed, therefore, that plaintiffs were fully informed as to the facts when they purchased their stock, and that assumption does not leave plaintiffs in a position to challenge the original transaction.

Plaintiffs further aver that they are holders of "securities" known as "state option contracts, series A and B," but the bill stops there. Turning to the answer we find that instead of being securities, these so-called State option contracts were

merely agreements entitling the holder thereof, upon the performance of his undertakings, to certain shares of stock as a bonus. But the bill does not specify any particular options, nor is there any allegation of performance by plaintiffs of the antecedent conditions. In other words, there is no averment from which the court can find that plaintiffs were entitled to receive anything from the District Company on account of their so-called securities. And the averment that Engle misappropriated $65,000, which it is alleged he received on account of such "securities," likewise is open to criticism on the ground of vagueness. If, as appears from the answer, the amount received by Engle was in payment for his own stock, and he defrayed the necessary expenses of the company as he had undertaken to do, there was no foundation for this averment.

We come now to the question whether, as minority stockholders, these plaintiffs may prevent the District Company from turning over its assets to the Arizona Company for the purposes indicated. That the articles of incorporation of the District Company were voidable is clear under the decision of this court in *Dancy* v. *Clark,* 24 App. D. C. 487. A corporation may not be lawfully formed here to accomplish all the objects enumerated in those articles, and no primary purpose is expressed, nor is one deducible from the language used. Consequently, the objects enumerated must be viewed as a whole, and, when so viewed, it is apparent that there was no warrant in law for the incorporation.

Operating under a voidable charter, the situation was still further complicated by the change of name, and no one is subject to particular criticism on this score, because the change was the result of a court proceeding in which evidently there was a misconception of the law. It goes without saying that a corporation has no power, unless authorized by law, to change its name; and it has been held that an unauthorized change of name is an abandonment not only of the corporate name, but of the corporation itself. *Cincinnati Cooperage Co.* v. *Bate,* 96 Ky. 356, 49 Am. St. Rep. 300, 26 S. W. 538, 7 R. C. L. ¶ 98. The change of name destroys the identity of the corporation.

The proceeding most frequently adopted to effect a change in the name of a corporation has been by special act of the legislature, unless there is a general provision authorizing such change. *Illinois Watch Case Co.* v. *Pearson,* 140 Ill. 423, 16 L.R.A. 429, 31 N. E. 400.    In the present case, the supposed authority for the change of name is to be found in secs. 1298 to 1300, inclusive, of the Code [31 Stat. at L. 1394, chap. 854].    Section 1298 formerly permitted "any person of full age" and a resident of the District to change his name by appropriate petition.    As amended, the section now permits "any person" who is a resident of the District to change his name by petition in equity, and "in case the applicant is an infant" the petition must be filed by the parent, guardian, or next friend.    In construing the Code the word "person" must be held to apply to partnerships and corporations, "unless such construction would be unreasonable."    In view of the language used in the sections referred to, we think it so plain that Congress was referring to natural persons that to include corporations would be an unreasonable construction of the provisions.    Congress, of course, had in mind that an individual is not a creature of the statute, and that the consequence of a change of his name is far different from that of a change of a corporate name.    The intent to include corporations, therefore, should be clear.    The attempted change of name by the District Company was abortive and constituted a still further infirmity.

This was a private corporation, formed solely for the pecuniary benefit of its stockholders.    Had all the stockholders assented, therefore, the sale of assets of the District Company to the Arizona Company might have been accomplished, for no question of public policy was involved.    The question, then, is whether these few stockholders may control the policy of the many, when the latter are acting in good faith and in the apparent interest of all.    It now is settled law that a minority of the stockholders of a corporation cannot hold a majority to an unprofitable and hopeless enterprise.    "By accepting a charter they do not undertake to carry on the business for which they are incorporated indefinitely, and without any regard to the condi-

tion of their corporate property. Public policy does not require them to go on at a loss. On the contrary, it would seem very clearly for the public welfare as well as for the interest of the stockholders, that they should cease to transact business as soon as, in the exercise of sound judgment, it is found that it cannot be prudently continued." *Treadwell* v. *Salisbury Mfg. Co.* 7 Gray, 393, 66 Am. Dec. 490.

In *Bowditch* v. *Jackson Co.* 76 N. H. 351, L.R.A.1917A, 1174, 82 Atl. 1014, Ann. Cas. 1913A, 366, after a statement of the rule that a majority may close out the affairs of the company when reasonable profits no longer can be made, the court said: "If the majority may sell to prevent greater losses, why may they not also sell to make greater gain? Bearing in mind that this is purely a business proposition, with no public rights or duties involved, there seems to be no substantial difference between the two cases, as a matter of principle."

*Beidenkoph* v. *Des Moines L. Ins. Co.* 160 Iowa, 629, 46 L.R.A.(N.S.) 290, 142 N. W. 434, contains a careful discussion of the question. It there was ruled that where a majority of the stockholders of a going and solvent insurance company, acting fairly and upon reasonable grounds, and for substantial business reasons, decide that the interests of all concerned require a sale of all of its assets to another company, equity will not interfere by the issuance of a temporary injunction at the suit of a minority stockholder.

In *Tanner* v. *Lindell R. Co.* 180 Mo. 1, 103 Am. St. Rep. 534, 79 S. W. 155, the right was recognized of a majority of the stockholders to rule within reasonable bonds, and it was held that "because all the stockholders have not consented to the sale (of the assets) it does not follow that the sale will be set aside regardless of the consequences." The court stated the general rule to be that an injunction will not be granted "when it will be productive of greater injury than will result from a refusal of it."

In *Bartholomew* v. *Derby Rubber Co.* 69 Conn. 521, 61 Am. St. Rep. 57, 38 Atl. 45, a manufacturing corporation, being unable to raise the capital necessary to continue its business with

profit, in good faith leased its plant for a term of years, with a privilege of purchase.   The minority stockholders attempted to have the lease adjudged void and set aside, but it was upheld by the court.   See also *Post* v. *Beacon Vacuum Pump & Electrical Co.* 28 C. C. A. 431, 50 U. S. App. 271, 84 Fed. 371; *New Hampshire Sav. Bank* v. *Richey,* 58 C. C. A. 294, 121 Fed. 956; *Levering* v. *Bimel,* 146 Ind. 545, 45 N. E. 775; *Phillips* v. *Providence Steam Engine Co.* 21 R. I. 302, 45 L.R.A. 560, 43 Atl. 598; 1 Morawetz, Priv. Corp. Sec. 413; 4 Thomp. Corp. Sec. 4443; 7 R. C. L. Sec. 287.

In the present case the majority stockholders, finding that they were operating under a voidable charter, that the attempted change of the name of the corporation had still further complicated the situation, and that under the laws of the District of Columbia it would be impossible to carry out their so-called State option contracts, were compelled either to take the action they did take or permit the corporation to come to an immediate and disastrous end.   That something was necessary to be done is apparent, and we are unable to perceive anything irregular or suspicious in what actually was done.   All the assets of the old company were turned over to the new, and all the obligations of the old were assumed by the new company. . The rights of the minority stockholders were as carefully provided for and safeguarded as were the rights of the majority.   The question therefore resolves itself into one of power, and under the rule announced in the case to which we have referred there is no room to doubt that power, and no ground for holding that it was unlawfully exercised.

The exercise of discretion by the trial court in issuing writs of certiorari, appointing receivers *pendente lite,* and the like, must be in accordance with established rules and precedents. *Billings* v. *Field,* 36 App. D. C. 16.   And when, as here, it appears that there has been a departure from such rules and precedents, the appellate court will not hesitate to act.   It follows that the decree must be reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.          *Reversed and remanded.*