WILLIAM N. ALLEN, complainant-respondent,

*v.*

THE FRANCISCO SUGAR COMPANY et al., defendants-appellants.

[Argued at June term, 1920. Decided February 28th. 1921.]

1. A corporation organized under the laws of this state may, under *2 Comp. Stat. p. 1600 § 2 pl. 2a*, with the assent of two-thirds of its stockholders, lease its property and franchises to another corporation, domestic or foreign.

2. A corporation chartered prior to that act could not so lease its property and franchises as against the objection of a stockholder, even though such stockholder acquired his stock after the passage of that act.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Fielder, and reported *ante p. 391.*

*Messrs. Lindabury, Depue & Faulks (Mr. Richard V. Lindabury* and *Mr. Josiah Stryker* of counsel), for the appellants.

*Messrs. McCarter & English (Mr. Robert H. McCarter* and *Mr. George W. C. McCarter* of counsel), for the respondent.

The opinion of the court was delivered by

KALISCH, J.

We concur in the result arrived at by the court below, but solely upon the grounds and for the reasons herein set forth. The facts are fully stated in the opinion of the learned vice-chancellor and, therefore, they need not be herein specifically reiterated. It is sufficient to state in a general way that the Francisco Sugar Company, a domestic corporation, was about to execute a lease for a period of ten years and eight months for its plant and land, practically all its revenue producing property, located in the island of Cuba, to the Compania Azucarera

Francisco, a Cuban corporation. The complainant, the owner of one. thousand five hundred shares of stock of the domestic corporation, filed his bill to restrain it from making the proposed lease to the foreign Cuban corporation. After a hearing on the bill of complaint and answering affidavits the vice-chancellor ordered an injunction, *pendente lite,* restraining the defendant sugar company from executing the proposed lease, and it is from that order the defendant company appeals.

The appellant was incorporated in February, 1899, at which time a few shares of stock were subscribed for and fully paid in cash. No other stock was issued until 1900, and it was of this latter issue of stock that the complainant acquired the shares which he now holds.

In March, 1899, a month after the appellant company incorporated, the legislature injected into the Corporation act a provision, which is section 2, *placitum 2a,* page 1600 (*2 Comp. Stat.*), providing as follows:

"Any corporation of this state, except railroad and canal corporations, may hereafter, with the assent of two-thirds in interest of its stockholders, either in person or by proxy, lease its property and franchises to any corporation, and every corporation of this state is hereby authorized to take the lease or any assignment thereof, for such terms and upon such conditions as may be agreed upon, and that any such lease or assignment, or both, heretofore made are hereby validated," &c.

Prior to the enactment of this statute, as fully indicated thereby, no such power to lease was embraced within the corporate powers of any corporation of this state.

As in the present instance the proposed lease was to be made to a foreign corporation, the learned vice-chancellor, in construing the statute above recited, held that the power conferred by that act was limited to a lease proposed to be made by one domestic corporation to another.

This view appears to us to be clearly erroneous. No such meaning, as was ascribed to the statute, by the court below, can be fairly gathered from the plain reading and spirit of it.

It is to be observed that the legislative act starts out with the broad term "any corporation of this state," but was careful to except thereout railroad and canal corporations; and then fol-

lows in broad language without exception or restriction, that such corporation may lease its property and franchises to any corporation. This could mean nothing else than that a corporation organized under the laws of this state may lease its property and franchises to a corporation either domestic or foreign. For, it is hardly necessary for us to add that if it was intended to restrict the leasing to New Jersey corporations, language apt to declare that purpose would have been, *to any corporation of this state.* This view is re-enforced by the fact that in conferring authority on corporations to take such a lease it uses the phraseology "any corporation of this state."

It is quite obvious that the legislature intended in that respect to deal exclusively with the corporations organized under the laws of this state, leaving to other states and foreign countries to deal with the matter of authorizing corporations organized under the laws of their respective jurisdiction to take such a lease. We, therefore, conclude that the statute clearly authorizes a lease by a New Jersey corporation to a foreign one.

The learned vice-chancellor further held that the act was inapplicable because it did not come into existence until a month after the organization of the appellant company so that it alters a contract between the stockholders.

It is clear from the decisions of our courts that before the passage of the statute the transaction contemplated to be transacted by the appellant company could not have been lawfully accomplished without the consent of all the stockholders. The complainant, in the present case, is the dissenting stockholder. The principle referred to is first clearly and forceably enunciated in a very able and learned opinion of Cortlandt Parker, embraced in a report made by him as master in chancery, in *Kean* v. *Johnson et al., 1 Stock. 401,* at which page the first two headnotes express the legal rule applicable to the present case.

"Where a board of directors, or a majority of stockholders deviate from the originally contemplated undertaking the 'rights' of other and dissenting stockholders are 'affected,' as against them they cannot legally do it."

"A majority of stockholders in a prosperous corporation cannot, at their own mere caprice, sell out the whole source of their

emoluments and invest their capital in other enterprises, where the minority desire the prosecution of the business in which they had engaged. The contract is that their joint funds shall, under the care of specified persons, generally called directors, be employed, and that for certain specified purposes." This case was decided in 1853.

The doctrine proclaimed in that case was followed by a long line of cases which are cited in the opinion of the court below.

In *Black* v. *Delaware and Raritan Canal Co.*, 24 N. J. Eq. 455, this court approved the legal rule as laid down in *Kean* v. *Johnson*, and said: "After stockholders in a joint stock company have entered into a contract among themselves, under legislative sanction, and expended their money in the execution of the plan mutually agreed upon, the scheme cannot be radically changed by the majority by virtue of legislative enactment, and a dissentient stockholder compelled to engage in a new and totally different undertaking, without impairing his contract with his associates and with the state." To the same effect is *Mills* v. *Central Railroad Co.*, 41 N. J. Eq. 1.

The doctrine, recognized by the cases cited, springs from the organic law which forbids the legislature from passing any law impairing the obligations of contract, or depriving a party of any remedy for enforcing a contract which existed at the time the contract was made.

Because it appears in the present case that the complainant did not acquire his shares of stock until after the passage of the Leasing act, the contention of counsel of appellant is that the complainant is not in the position of a stockholder who had acquired his shares of stock before the act was passed, and, therefore, he must be considered as one whose "rights" as a shareholder was fixed by the statute at the time he bought his stock.

It is true that in *Colgate* v. *United States Leather Co.*, 73 N. J. Eq. (at pp. 79, 80), Vice-Chancellor Emery observed that there is a difference between the rights of a stockholder who has purchased his share of stock before the passage of a statute altering the charter of the corporation and one who has made his purchase of such shares after the legislative change. But, in that case on appeal, this court, in an opinion by Chancellor

Pitney (in *75 N. J. Eq.*, at *p. 235*), expressly refrained from passing upon that and other questions discussed by the learned vice-chancellor.

It seems to us that to adopt the contention of counsel of appellant to the effect that the "rights" of the stockholder are fixed at the time he purchased his stock, and not by the original charter of the corporation, would be to lay down a rule which would tend to inextricable confusion.

There would be as many varied and distinct rights of stockholders depending upon the time of purchase as there were alterations in the charter affecting such rights.

A person proposing to buy stock could only properly protect himself against imposition of terms not warranted by the original compact, by having a sort of title search made to every stock certificate purchased. To impose such a burden on stock would destroy its value in the business world. It would detract from its negotiability. The sound rule must, therefore, be that the buyer of stock whenever purchased comes into the original compact. He buys a share in that compact as well as in the property.

For the appellant it is further contended that under the reserved right which the legislature has to repeal or alter a charter, the purchaser of stock can only acquire such rights as existed at the time of the purchase. In *Zabriskie* v. *Hackensack and New York Railroad Co., 18 N. J. Eq. 178,* it was held that a legislative charter is a contract between the state and the corporation which the state cannot impair; and that corporators or partners associated for a special purpose specified in their charter or articles of partnership, cannot change that purpose without the consent of all the corporators or partners; and that a reservation in a charter that the state may at any time alter, amend or repeal, it is a reservation made by the state for its own benefit, and is not intended to affect or change the rights of corporators as between each other. Nor does it authorize the state to authorize one part of the stockholders, for their own benefit, at their mere option, to change their contract with the other part; and that the power is restrained to the powers and franchises granted by the charter. It does not authorize the

legislature to change the object of the incorporation, or to substitute another for it. An alteration or modification is necessarily of the grant or thing to be altered or modified, and cannot be done by substituting a different thing. Chief-Justice Beasley, in *New Jersey Midland Railroad Co.* v. *Strait, 35 N. J. Law* (at *p. 325*), speaks approvingly of the doctrine above enunciated. And this court, speaking through Mr. Justice Van Syckel, in *Berger* v. *United States Steel Corporation, 63 N. J. Eq.* (at *p. 824*), says: "It must be conceded that it is firmly settled in our jurisprudence that the rights reserved in this sixth section to amend, alter or repeal charters extends only to the modification or destruction of rights as between the state and the corporation, but that the rights of the stockholders *inter sese* can in no respect be impaired, except in so far as impairment may result from an alteration required by the public interest."

The views promulgated by the decisions referred to lead us therefore to the conclusion that the power of the court below was properly exercised in granting the preliminary injunction.

Having reached this result it is unnecessary to consider the question whether or not the transaction challenged by the complainant was or was not against the public policy of the federal government, discussed by the vice-chancellor in his opinion, and, therefore, we express no opinion on the matter.

For the reasons stated the order granting the preliminary injunction is affirmed, with costs.

MINTURN, J. (affirming).

An injunction *pendente lite* was granted restraining the Francisco Sugar Company, a corporation of this state, from executing a lease of practically all of its assets of the value of $1,000,-000 to a corporation organized under the laws of the Republic of Cuba, whose capital stock is only $100,000.

The dividend paid to its stockholders in June, 1919, was twenty per cent. in cash, and its business became so prosperous during the aftermath of the war that it is estimated recurring dividends are likely to exceed former payments.

The complainant owns one hundred and fifty shares of stock, and his bill is filed for the purpose of preventing the consummation of a transfer for ten years, of the assets of the corporation, to the Cuban concern. The purpose of the transfer, confessedly, is to avoid the payment to the United States government of the federal income taxes imposed for war purposes. That fact is averred in the affidavits; is not contradicted upon the record, and was frankly avowed by counsel for defendant upon the argument. With the questions of legal procedure argued involving the construction of the Corporation act, and the so-called Leasing act of 1899, I am in accord with the views expressed in the majority opinion of the court. But the all-important question, as I view it, is whether a corporation of this state may upon an open confession at the bar of this court of its purpose to circumvent the law of the land, obtain the imprimatur of the court upon its dubious undertaking.

In dealing with the proposition we have to recall that we are dealing not with the mentality of an individual, who may change his *situs* and his point of view *ab libitum,* but with an artificial creation of the state itself, whose *situs* is absolutely fixed by law, and the quality of whose mentality can be manifested only in the nature of the act it employs in the process of circumvention. May such an artificial creation of the state set at defiance the mandate of the power to which it owes its being? Such is the practical concrete legal inquiry, which surpasses in legal importance any academic question of statutory construction in which these proceedings may be enveloped. If this defendant may carry into execution the proposed scheme, every corporation transacting a foreign business may do likewise, and a precedent is thus set, whereby the ominous result may be attained of shifting corporate taxation to the shoulders of the already overburdened individual. To sustain the proposal a parallel is attempted between the individual who does a similar act to "avoid" rather than to "evade" taxation and the corporate attempt to do likewise.

If such an esoteric distinction exist in the domain of lexicography and etymology, as applied to the individual, it must be based in legal significance upon the *bona fides* or the *quo animo*

of the act itself, which is a matter for the individual conscience to settle, rather than for the application of rigid legal rules. But since the artificial being we are dealing with, if we may credit Coke and Blackstone, is not possessed with such a moral harassing attribute, we are left without means of determining the character of its proposed act, except by perceiving the results of its execution, for good or evil, upon the body politic.

Among the recondite legal *dicta* invoked to sustain the proposition is that incongruous and extraordinary effusion of Lord MacNaughton in *Commissioners* v. *Byrne, A. C. 392,* wherein his lordship observes: "No one may act in contravention of the law. But no one is bound to leave his property at the mercy (*sic*) of the revenue authorities if he can legally escape (*sic*) their grasp;" a declaration which is tantamount to enunciating that one must observe the law, but if the law should work inconvenience to him he may lawfully defeat its execution by legally circumventing it; which paradox in practical application, is reminiscent of the legal metaphysics indulged at the sepulchre of Ophelia, where it was gravely and sagely observed that "an act hath three branches; it is to act, to do and to perform." One is apt to inquire where in such a metaphysical atmosphere the line of demarcation is to be drawn, for if we accept the abstract doctrine, manifestly the elemental definitions of law become shattered beyond recognition. But whatever concession in this respect may be accorded to the individual, whose habitat and mental *bona fides* may be changed *ab libilum,* no such concession can be admitted in the case of the state created corporation, which is possessed of no such convenient personal attributes, but which is the creature of the law-making power, generated upon a theory of public policy due to a state conception of public convenience, to accord with which public purpose, it is presumed the artificial creation will at all times shape its course and guide its conduct.

If the doctrine of his lordship were accepted as embodying the spirit of the law, it is manifest that compliance with any law is relegated to the dubious domain of personal convenience; and its execution thus becomes a mere pawn upon a legal chess board, unavailable against one capable of circumventing it by

specious logic, legal finesse or scholastic refinement. A body of law depending for its enforcement upon such a construction, must shock the moral sense and law-abiding proclivities of the average citizen, who at all times and in every exigency, is called upon for public sacrifice; and who in the patriotic nomenclature of the day, is expected to measure up to a maximum of civic duty, estimated with mathematical exactitude, in the percentages of the counting house.

If this power be conceded to exist in all corporations, and were generally exercised in these days of corporate enterprise, obviously, there must be an end to orderly government; for without the practical effectuation of the taxing power, government must cease to function; and in such a status one needs not the vision of a seer to perceive the advent of Milton's Inferno of "Chaos and Old Night."

The learned vice-chancellor declared that the "avowed purpose is to save the stockholders a million dollars of federal income taxes." But stated inversely the undisguised purpose is to prevent the federal government, and, incidentally, the state, collecting by taxation $1,000,000 annually from one of the state's creatures, and thus shift the burden of the tax to the shoulders of the individual; and the learned vice-chancellor properly held that public policy will not sanction such a proceeding. The public policy of the general government, as indicated by its constitution and laws, becomes *ex necessitate* the public policy of the state, and, therefore, a law or policy of the latter, which contravenes the public policy of the union, is as nugatory as any law which militates against the constitution itself. *Weston* v. *Charleston, 2 Pet. 449; McCulloch* v. *Maryland, 4 Wheat. 316; Texas* v. *White, 7 Wall. 700; Farmers, &c., Bank* v. *Dearing, 91 U. S. 29.*

In *Brooks* v. *Cooper, 50 N. J. Eq. 768,* this court declared that "an agreement to contravene a statute in fraud of the public, or to the injury of private parties, savors of a conspiracy;" and further, that "whatever tends to interfere with or control the administration of the law as to executive, legislative or other official action, whenever embodied in, and made the subject of a

contract, the contract is against public policy, and therefore void and not susceptible of enforcement."

To the same effect are *State* v. *Jersey City, 34 N. J. Law 397; Stroud* v. *Water Co., 56 N. J. Law 429.*

Lord Brougham's definition of public policy, which declares that "no one can lawfully do that which has a tendency to be injurious to the public welfare," presents the rationale upon which the doctrine is based. *Salus populi suprema lex,* of course, is the basic proposition of government; and there is, says Montesque, illustrating the practical application of the maxim, an "implied assent on the part of every member of society, that his own individual welfare shall in case of necessity yield to that of the community; and property, liberty and life shall under certain circumstances be placed in jeopardy, or even sacrificed for the public good." *Spirit of the Laws, Lib. 27 ch. 23.*

In *Ransom* v. *Burlington, 111 Iowa 77,* it was declared that "while one may lawfully dispose of his property to avoid taxation, a mere manipulation in the guise of disposition, *the only effect of which is to avoid the tax,* will not be upheld."

To the same effect is *Cooley Const. Lim. 769,* and *Mitchell* v. *Commissioners, 91 U. S. 206,* and *Sholwell* v. *Moore, 129 U. S. 590.*

In ascertaining the *quo animo,* recourse may be had to the emphatic and illuminative language of Chief-Justice Wilmot, of England, in *Collins* v. *Blantern, 2 Wils. 341:* "This is a contract to transgress the law, to do which is injurious to the community. It is void by the common law, and the reason why the common law says such contracts are void, is for the public good. You shall not stipulate for iniquity."

These considerations lead me to concur in the views of the learned vice-chancellor, on this aspect of the case, and to vote for the affirmance of the decree appealed from.

I am requested to state that Mr. Justice Black and Judge Williams concur in these views.

WHITE, J. (dissenting).

My vote for reversal is based solely upon the fact, as appears in the case without contradiction, that after the act of 1899 was

passed the corporation brought up and retired all its then outstanding capital stock, and thus with a clean slate started over again with its new issue of capital stock under its charter, which contained an express clause authorizing, as I think, such leasing as is now contemplated. The effect of this action in legalizing from that time on what before the act had been an unauthorized power in the charter was, I think, exactly the same as if, with the express consent of all of the stockholders, the corporation had formally accepted the enlargement of its charter powers provided for in the act. Such an acceptance with such consent would, I think, have been binding upon all subsequent stockholders. *Rankin* v. *Newark Library Association, 64 N. J. Law 265.*

Upon the question of public policy I think the answer must depend upon the legality of the proposed lease rather than upon the reasons for making it. If I own a sugar plantation in Cuba which is so highly profitable that before our federal excess profits tax was imposed I refused an offer from a Cuban citizen of $1,000,000 for its purchase, but under the operation of that tax I conclude I would be better off if I accepted the offer and invested the proceeds in United States first liberty loan bonds, which are not taxable at all, I think I am at liberty to do so, although avoidance of the federal tax is the effect and also the moving cause of my so doing.

It is said, however, that as the lessor company owns all the stock of the foreign lessee corporation, the whole thing is a sham to evade federal taxation. The answer to this is, that if it is a sham it will not evade the taxation, and, consequently, the ground for declaring an otherwise legal transaction unlawful because contrary to public policy does not exist.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, WILLIAMS, TAYLOR, ACKERSON —9.

*For reversal*—SWAYZE, BERGEN, KATZENBACH, WHITE, HEPPENHEIMER—5.