# JAMES F. PATERSON AND OTHERS v. SHATTUCK ARIZONA COPPER COMPANY AND OTHERS.[1]

No. 28,373.

August 12, 1932.

[1]Reported in 244 N. W. 281.

612

*Hugh J. McClearn, John G. Williams,* and *Oscar Mitchell,* for appellants.

*Harris Richardson,* for respondents.

DIBELL, J.

Action to restrain the defendants Shattuck Arizona Copper Company and Denn Arizona Copper Company, corporations under the laws of Minnesota, from consolidating under the name of Shattuck Denn Mining Corporation, a corporation under the laws of Delaware; to enjoin the Shattuck Arizona from taking steps towards its own dissolution or transferring its property to the Shattuck Denn corporation; adjudging that the money or property or franchises of the Shattuck Arizona which it had sought to transfer to the Shattuck Denn remains the property of the Shattuck Arizona; adjudging transfers so made to be ultra vires and illegal and void; and appointing a receiver for the Shattuck Arizona to take possession of its property and recover such as was transferred or delivered to the Shattuck Denn under the consolidation. There were findings and conclusions for the plaintiffs granting the specific relief asked, including the appointment of a receiver. The defendants Shattuck Arizona and Denn Arizona appeal from the order denying their motion for a new trial. Service was not had upon the Shattuck Denn, although it was sought. See Paterson v. Shattuck Arizona Copper Co. 169 Minn. 49, 210 N. W. 620.

■ The defendant Shattuck Arizona Copper Company is a Minnesota corporation organized on March 23, 1904, with a capital stock of $3,500,000 in 350,000 shares of $10 each, all of which were issued. The plaintiffs own 597 shares. Its articles of incorporation relative to the character of its business are as follows:

"The general nature of the business of this corporation shall be the mining, smelting, reducing, refining and working of iron ores, copper ores, and other minerals; and the manufacturing of iron, steel, copper and other materials, and the marketing of any such ore or products, any and all of said business to be carried on in the State of Minnesota, Territory of Arizona, or elsewhere.

"The place of the principal office or headquarters of this corporation shall be Duluth, St. Louis County, Minnesota."

From the time of its organization until October 26, 1925, it was engaged in developing and operating mining properties in the Warren District at Bisbee, Arizona, producing principally copper, some lead, and silver and gold as by-products. From July 20, 1910, to January 20, 1920, it made 43 capital or dividend distributions amounting to $7,612,500, which was twice its capital and $612,500 over. After the last date it paid no dividends, and there were substantially no net profits and nothing fairly justifying dividends. Its reserve bodies of ore were depleted, and it was thought to be reaching a condition of exhaustion. The trial court found as follows:

"Sixth: That said Shattuck Arizona operated at a small profit from January 1, 1924, to October 26, 1925, and during this period made to stockholders no dividend or capital distribution payments; that its financial and physical condition, on October 26, 1925, was practically the same as on December 31, 1924.

"Seventh: That previous to the year 1919, operations of Shattuck Arizona had been profitable, but beginning with the year 1919, due to the decline in the price of copper and lead, and to the high costs of operation, Shattuck Arizona was unable to operate at a profit, and on December 1, 1920, it ceased active mining operations,

and in August, 1921, it entirely shut down and remained shut down until the spring of 1923, when it resumed operations and continued same to about October 26, 1925.

"Eighth: That in 1923 Shattuck Arizona Copper Company, before depletion and depreciation, operated at a profit of $139,694, but after depletion and depreciation, at a loss of $2,264, as is shown in the income statement for 1923, appearing in its annual report for the year 1923; that in 1924 it operated before depletion and depreciation at a profit of $10,221."

Following is the balance sheet of the Shattuck Arizona as of December 31, 1924, which may be considered with the findings quoted above.

"Shattuck Arizona Copper Company

Balance sheet—December 31, 1924.

### Assets

| | | |
|---|---:|---:|
| Mining property | $8,349,015.62 | |
| Less depletion reserve | 2,801,357.98 | $5,547,657.64 |
| | | |
| Buildings, plant and equipment | 587,280.79 | |
| Less depreciation reserve | 383,710.77 | 203,570.02 |
| | | $5,751,227.66 |
| Deferred charges for development | | 25,020.18 |
| Cash on hand | 305,649.15 | |
| U. S. Government Liberty Loan bonds | 500,000.00 | |
| Other securities | 8,500.00 | |
| Bills and accounts receivable | 72,170.80 | |
| Interest accrued | 7,628.48 | |
| Sold copper on hand | 135,912.00 | |
| Unsold copper on hand at cost | 629,479.71 | |
| Ores on hand and in transit at cost | 18,871.73 | |
| Materials and supplies | 151,921.82 | 1,830,133.69 |
| | | $7,606,381.53 |

### Liabilities

| | |
|---|---:|
| Capital stock | $3,500,000.00 |
| Property surplus | 3,839,015.62 |

616

| | | |
|---|---:|---:|
| Accounts payable | 21,627.46 | |
| Bullion freight and refining, not due | 14,049.05 | |
| Selling expense, not due | 11,704.79 | |
| Reserve for taxes | 11,792.38 | 59,173.68 |
| Reserve for accidents | | 20,000.00 |
| Surplus from operations, per annexed statement | | 188,192.23 |
| | | $7,606,381.53 |

The court found that there was no radical change from December 31, 1924, on; and upon defendants' motion for an amendment it found upon the item of fixed assets of $5,757,227 as follows:

"This finding is made with the qualification that the item of $5,757,227, appearing in said balance sheet as the value of fixed assets was carried, in part at least, for taxation purposes and may not accurately represent the true value of said fixed assets as of the 31st of December, 1924."

This refers to the set-up as a basis for computing taxes under the revenue act. Neither from the printed record nor the mass of original documents returned do we find the exact amount. While the deduction is appreciable and perhaps large, it does not so greatly affect the result as to call for further inquiry.

The defendants claimed that there should be added to the liabilities, in addition to the two items making $79,173.68, the amount of $165,432, at which its excess profits and income tax was adjusted with the United States government; and that the actual liabilities of the Shattuck Arizona were $244,605.68, made up of the $79,173.68 and the $165,432. This is conceded.

The Shattuck Arizona was a going concern, not financially embarrassed, had no preferred stock or bonded indebtedness, a stock liability of $3,500,000, and sufficient assets to pay par to its stockholders, if put in liquidation, and a large sum in excess for distribution.

Leaving the Shattuck Arizona for the moment, we consider the defendant Denn Arizona Company, a Minnesota corporation incorporated in January, 1907. The nature of its business was stated in its articles and was the same as that of the Shattuck Arizona, before quoted. Its capital stock was $3,500,000 in shares of $10 each, all of which were issued. On January 20, 1917, its articles were amended so as to increase its capital stock by $1,500,000 in shares of $10 each, making its authorized capital $5,000,000. One hundred thousand shares of its increased capital stock were offered to its stockholders pro rata at par, and all were taken except 584 shares of the par value of $5,840, so that its outstanding capital was as it is now, $4,494,160, represented by 449,416 shares.

The Denn Arizona purchased the property of a development company known as the Denn Arizona Development Company at Bisbee and a number of other mining claims. The properties were near the Shattuck Arizona but not immediately adjoining it and in a different formation. They were not workable with it. The Denn Arizona developed and mined intermittently until May 11, 1925. Its property was in good faith believed to be of great potential value by those interested in its ownership. Its stock was held in large part by the stockholders of the Shattuck Arizona, and to a large extent the large shareholders of the Shattuck Arizona were owners of large amounts of the stock of the Denn Arizona and their ownership in the Denn Arizona was in excess of their ownership in the Shattuck Arizona. It found it necessary to borrow large amounts of money and had borrowed from the Shattuck Arizona and from the bank which was controlled by the Shattuck Arizona. It paid no dividends. It had trouble in financing. Its balance sheet of December 31, 1924, was as follows:

"Denn Arizona Copper Company

Balance sheet—December 31, 1924.

Assets

| | | |
|---|---|---|
| Mine property account | $4,402,153.90 | |
| Construction and equipment | 275,533.33 | $4,677,687.23 |

| | |
|---|---:|
| Cash | 459.70 |
| Accounts receivable | 118.54 |
| Materials and supplies | 52,488.73 |
| | $4,730,754.20 |

Liabilities

| | |
|---|---:|
| Capital stock issued | $4,494,160.00 |
| Notes payable | 76,387.10 |
| Current accounts payable | 183.87 |
| Reserve for taxes | 2,140.39 |
| Reserve for depreciation | 157,882.84 |
| | $4,730,754.20 ="|

It will be noticed that its mine property account was put at $4,402,153.90 as an asset. It had cash of $459.70 and accounts receivable of $118.54. As liabilities it had its capital stock issue of $4,494,160, notes payable of $76,387.10, and an item for reserve for depreciation of $157,882.84. It was without substantial liquid assets.

The findings show that from its incorporation in 1907 the Denn Arizona prospected intermittently; that it had a difficult time; that it had financial trouble and issued $1,500,000 in additional stock, of which it used $1,000,000; that it borrowed from its stockholders; that it borrowed of the Shattuck interests, friendly to it, large amounts; and that interest due by it was forgiven. The report accompanying the balance sheet said:

"The company now owes, with accrued interest, approximately $90,000. Cash on hand amounts to only a few hundred dollars, and further financing will be necessary."

In short, 18 years after its organization it had no net product, had met with mining difficulties, had refinanced itself by an additional issue of stock and by borrowing from its stockholders and those friendly to the Shattuck, and was still in debt, its condition calling for further financing. The trial court finds:

"That on said 26th day of October, 1925, the amount of ore which had been developed and remained unmined in or upon the mining claims of Denn Arizona, was of comparatively small extent, as hereinbefore found, but previous to that date extensive explorations had been conducted on certain of the mining claims of said company, and, in view of the results of such explorations, and the character of material encountered, and their knowledge and advice with refer ence to the geological formations of the district in question, the officers, directors and principal stockholders of the Denn Arizona, as well as the officers, directors and principal stockholders of the Shattuck Arizona, on said 26th day of October, 1925, entertained the belief, in good faith, that the potential ore deposits of the Denn Arizona were of great value and could be successfully mined with the aid of proper financing, under favorable market conditions."

The plan of consolidation had in view the organization of a corporation which would take over the properties of the two Minnesota companies. This corporation, called the Shattuck Denn Mining Corporation, was organized on May 20, 1925, under the laws of Delaware. It was given extensive charter powers. Under date of July 1, 1925, the Shattuck Arizona and the Denn Arizona wrote a joint letter to the stockholders of the two companies, the opening portion of which was as follows:

"For some time the Board of Directors of your respective companies have carefully considered the advisability of combining the interests and properties of the two companies, and have come to the unanimous conclusion that such consolidation would work to the advantage of the stockholders of both companies.

"The Denn Arizona Copper Company owns mining property in Bisbee, Arizona, consisting of more than two hundred acres of land favorably located, and confidently believed to be of great potential value. However, it is only partially developed and the company lacks available funds to complete such development and for working capital. The Shattuck Arizona Copper Company on the other hand has sufficient cash and other liquid assets and an efficient organization, and feels that it ought to secure more mining prop-

erties to enlarge and supplement its present holdings. If combined, the properties of both companies could be fully developed and profitably operated without any outside financing as soon as there is a reasonable recovery in the copper industry.

"Your respective Boards have adopted and recommend to the stockholders of both companies a plan which they believe fair and advantageous to all concerned, and all members of both Boards have agreed to participate to the full extent of their holdings in both companies. Many other stockholders have expressed their approval of the plan and given assurance that they would participate. The plan proceeds on the assumption that a share of the Shattuck company is of equal value with a share of the Denn Company."

The capital stock of the Shattuck Denn was 1,000,000 shares of no par value. It set aside 800,000 shares for the purchase of the 350,000 shares of the Shattuck Arizona and the 450,000 shares of the Denn Arizona, and the remaining 200,000 shares were retained in the treasury. The directors and stockholders of the two Minnesota companies by proceedings regular in form accepted the offers of the Shattuck Denn to exchange stock share for share. A meeting of the stockholders of the two companies was had on October 26, 1925. In the meantime some of the shares of the Shattuck Arizona and some of the Denn Arizona had been sent in for exchange pursuant to the plan and were held by the Shattuck Denn. The shareholders of the Denn Arizona acceded to the plan more readily than those of the Shattuck Arizona. At the meeting of October 26, 1925, it was proposed that all of the property of the Shattuck Arizona and Denn Arizona, real and personal, be conveyed to the Shattuck Denn, and that the Shattuck Denn assume the debts and liabilities of the two companies—the plan still being that a share of the Shattuck Denn was exchangeable for a share of either the Shattuck Arizona or Denn Arizona. The proposition was carried by 264,201 shares of the Shattuck Arizona in favor and 557, owned by the plaintiffs, opposed. The number of shares opposing appears continually as 557, while the number of shares owned by the plaintiffs appears continually as 597. The Shattuck Denn at this meeting voted shares which it

had procured from one or the other of the Minnesota companies. This did not make the transfer wholly void. The boards of the Shattuck Arizona and Denn Arizona made up the board of the Shattuck Denn. This sufficiently states the method of consolidation. The plaintiffs filed a written protest, the first and second paragraphs as follows:

"First: That this offer of the Shattuck Denn to be considered at this special meeting cannot legally be accepted and the sale or exchange proposed therein consummated by Shattuck Arizona, without the consent of every stockholder thereof, and over the protest, and against the consent of a single stockholder thereof.

"Second: That the proposition contained in this offer is not fair or advantageous for Shattuck Arizona, or its stockholders, and should not be accepted."

They assumed the same position at the trial. One of their counsel, personally connected with the plaintiffs, stated on the witness stand in response to a question:

Q. "That legal proposition which you tried to make them understand in your letter of October 21, 1925—did you try to make them understand at the meeting of October 26, 1925—that was that if a single stockholder owning a single share of stock objected, that then the consolidation could not go through?

A. "That is the law.

\* \* \* \* \* \*

Q. "You argued that to them at the meeting of October 26, 1925, didn't you?

A. "I told them that, yes."

The court finds:

"That by this plan for the merger and consolidation of Shattuck Arizona and Denn Arizona, Shattuck Arizona and the stockholders thereof would have received in the combined assets of Shattuck Arizona and Denn Arizona a 7/16ths interest, while Denn Arizona and the stockholders thereof would have received a 9/16ths interest."

And further:

"That the consideration to be received under the said proposition of Shattuck Denn for the transfer to Shattuck Denn by Shattuck Arizona of all its property and franchises was not fair and adequate, as of the 26th day of October, 1925."

It is a circumstance which may be noted that five directors of the Shattuck Arizona owning 64,201 shares owned 214,891 shares of the Shattuck Denn; so that if there was an advantage in the distribution on the basis of equality of exchange between Shattuck Arizona and Denn Arizona the shareholders of the latter gained through their larger relative ownership in the Denn Arizona.

And relative to the physical condition of the Shattuck Arizona at the same time the court found:

"That on and prior to the 26th day of October, 1925, that part of the mining claims of the Shattuck Arizona which had been opened up and in and upon which mining operations had been conducted and from which shipments of ore had been made, was nearing the point of exhaustion; that on said date a considerable area of said mining claims, a part of which contained mineral indications, had not been explored or tested for ore deposits."

And relative to the officers and stockholders of the two Minnesota companies the court found this:

"That the officers, directors and principal stockholders of the Shattuck Arizona and of the Denn Arizona, in what they did in respect to the attempted consolidation of the two companies, were not actuated by intentional wrongdoing and were not guilty of individual moral delinquency in the premises."

With this background of facts we approach the consideration of the questions of law involved and the claims of the plaintiffs as to their equities. At the outset is the claim upon which they rely as absolute and controlling, that is, that as against a dissenting stockholder the other stockholders, no matter in how good faith, could not dispose of the corporation property and disable the corporation from carrying on the objects of its creation. The defendants con-

fidently asserted that they acted in good faith; that their stockholders were in the majority, 264,201 to 597; and that there was nothing of which the plaintiffs could complain. The defendants take some credit to themselves because they offered to pay the plaintiffs, as they do now, for their stock at its market value as of October 26, 1925. This would amount to a right in good faith majorities to buy out at market value minority stockholders dissenting on vital grounds.

The trial of the case commenced on October 15, 1928. On October 11, 1930, the defendants moved for leave to amend their answer alleging that they acted in good faith on October 26, 1925, in making the consolidation; and that they had offered in and out of court to pay the plaintiffs the value of their stock on the date stated. This was more than a year after the findings of fact, and the motion was denied on the same day as the denial of the motion for a new trial, October 16, 1930. At the best it was a belated offer; but no pleading was necessary, and all the evidence it was desired to offer was received. In any event, when the trial opened the plaintiffs insisted that it was enough that their few shares dissented, and the defendants asserted that the large majority in favor of the proposed action controlled; and the war was on.

It may be said fairly that the defendants have been free to disclose the actual facts of the case. The claim of the plaintiffs in dollars is relatively small. There is a suggestion in one of the briefs that the plaintiffs' purpose was to make a sale at a fortunate price. The suggestion is unworthy as far as the record discloses. There is nothing to indicate that the 597 shares are so-called nuisance shares. The plaintiffs are contesting vigorously, but the record does not show that their shares represent anything but an ordinary investment and that held for many years.

■ The usually stated rule is that neither the directors nor a majority of the stockholders can dispose of the corporate assets as against the objection of a minority. In Des Moines L. & A. Co. v. Midland Ins. Co. 6 F. (2d) 228, 230, it is said by the United States district court of this district:

"This rule is based on the theory that each stockholder has a right to insist that the corporation shall fulfill the purpose for which it was organized, unless its condition cannot properly permit that to be done."

And it is sometimes said that such a disposition of the corporate property defeats the corporate purpose, or works a dissolution, or is ultra vires. See note, 7 Va. L. Rev. 640; Noyes, Intercorporate Relations (2 ed.) § 111. It may be noted that our statutes permit a dissolution, and there is no public policy against it. G. S. 1923 (2 Mason, 1927) §§ 7447, 7484, 8015-8019; 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 2122.

It is said and denied that the rule at common law was that a corporation against the will of a minority of its stockholders could not dispose of all the corporate assets. See 30 Harv. L. Rev. 335. It is really of no great concern what the common law was. At the time of the separation of the colonies the business transactions performed through the instrumentality of corporations were limited in number and scope and were not of a complex character. Ordinarily those who made up a corporation invested their money and embarked their services in it. There was a resemblance to a partnership; and if a majority of the copartners could not sell the copartnership business, the ready argument was that a corporation could not sell its business through a majority of the stockholders against the objection of a minority. There was something of unity between the stockholders and the corporation. While the rule against a transfer of all the corporate assets is asserted and given effect as occasion requires, the tendency of the decisions and the effect of statutes is to prevent a minority dictation while holding a good faith and honest majority to account in the conduct of the corporate business and the earning of profits; and the growth in part is by engrafting exceptions upon the old strict rule. There is a strict rule and a liberal rule.

The liberal rule is stated in Treadwell v. Salisbury Mfg. Co. 73 Mass. (7 Gray) 393, 404, 66 Am. D. 490, in this wise:

"At common law, the right of corporations, acting by a majority of their stockholders, to sell their property is absolute, and is not limited as to objects, circumstances or quantity."

And further the court says:

"Neither the public nor the legislature have any direct interest in their business or its management. These are committed solely to the stockholders, who have a pecuniary stake in the proper conduct of their affairs. By accepting a charter, they do not undertake to carry on the business for which they are incorporated, indefinitely, and without any regard to the condition of their corporate property. Public policy does not require them to go on at a loss. On the contrary, it would seem very clearly for the public welfare, as well as for the interest of the stockholders, that they should cease to transact business as soon as, in the exercise of a sound judgment, it is found that it cannot be prudently continued."

In harmony with the Massachusetts case there may be noted: Beidenkopf v. Des Moines L. Ins. Co. 160 Iowa, 629, 142 N. W. 434, 46 L.R.A. (N.S.) 290; Halpern v. Grabosky, 296 Pa. 108, 145 A. 834; Nave-McCord Merc. Co. v. Ranney (C. C. A.) 29 F. (2d) 383; Cohen v. Big Stone G. I. Co. 111 Va. 468, 69 S. E. 359, Ann. Cas. 1912A, 203.

Cases, modern and old, adopting the strict rule and leaving the consequences of a departure from it to be taken care of as they arise, are Abbot v. American H. R. Co. 33 Barb. 578; Kean v. Johnson, 9 N. J. Eq. 401; American Seating Co. v. Bullard (C. C. A.) 290 F. 896; Forrester v. Boston & M. C. C. & S. M. Co. 21 Mont. 544, 55 P. 229, 353; Allen v. Francisco Sugar Co. 92 N. J. Eq. 431, 112 A. 887. The case of Small v. Minneapolis E. M. Co. 45 Minn. 264, 47 N. W. 797, lends some force to the plaintiffs' contention. There it was held that the majority stockholders against a protest of the minority could not transfer the property of the corporation and surrender the management of its business to a foreign corporation for the period of 25 years in consideration of a specified percentage of the profits. It is the business of a corporation to continue rather than to abandon the work for which it is chartered. It is the ex-

ceptional case when it may sell out all of its assets. The case is an interesting one but not at all controlling on the result here; for, conceding that all that is held there is good law, it does not apply to the situation before us. And see Geddes v. Anaconda C. M. Co. 254 U. S. 590, 41 S. Ct. 209, 65 L. ed. 425. Other cases sustaining the plaintiffs are cited in 14 C. J. p. 865, §§ 1322-1323; 3 Cook, Corp. (8 ed.) § 670; 4 Thompson, Corp. (3 ed.) § 2501; Ballantine, Manual of Corp. L. & Pr. § 177.

The different doctrines, affected as they are by a variation in the facts of the cases and in the statutory or charter authority conferred, are discussed by the law writers helpfully. 30 Harv. L. Rev. 335; 20 Colum. L. Rev. 344; 7 Va. L. Rev. 640; 30 Yale L. Journ. 633; 14 Minn. L. Rev. 58; 78 U. Pa. L. Rev. 423; Id. note, 881. And see Noyes, Intercorporate Relations, § 108, et seq; Ballantine, Manual of Corp. L. & Pr. § 57, et seq; 2 Dunnell, Minn. Dig. (2 ed. & Supp.) §§ 2014, 2074.

It does not seem likely that stockholders, through corporate action, could be required to become members of a corporation of a different state and be subjected to different liabilities or to accept stock therein in lieu of their own. The trial court said in reference to this:

"No statutes have been cited which contemplate or authorize the merger of domestic corporations into a foreign corporation. To permit such a procedure would require minority stockholders, against their will, to become stockholders in a corporation wholly subject to foreign jurisdiction and possibly with powers and liabilities vastly different from those of the domestic corporation of which they may have become members. This situation is well illustrated by a reference to the certificate of incorporation of the Shattuck Denn."

Again, the corporation does not own the stock of its stockholders and cannot exchange it for other stock; and it can accomplish such result only by securing action by the stockholders. The corporation does not own the stock; nor do the stockholders in a legal sense own the corporate property.

Reverting to the liberal rule stated in the Massachusetts case, we quote from Bowditch v. Jackson Co. 76 N. H. 351, 355, 82 A. 1014, 1017, L. R. A. 1917A, 1174, Ann. Cas. 1913A, 366:

"It is admitted on all sides that the majority may sell out if the corporation is insolvent. And when brought face to face with the question whether they must wait until the stockholders' investment is all lost before taking action, the conclusion has been that if insolvency is imminent action may be taken. And the same is true if it is imprudent to continue. 4 Thomp. Corp. § 4489, and authorities cited. One reason only is given why the power exists in these cases: It is reasonable to suppose that such authority was contemplated, because this is what sound business judgment dictates should be done."

In 30 Harv. L. Rev. 335, at page 358, Professor Warren, upon a thorough consideration and review of the cases, states this view:

"It is submitted that the holders of a majority of the stock of a corporation organized for profit have the power to cause a transfer of all the corporate assets and a distribution of the proceeds (after satisfying creditors) to the stockholders whenever, for legitimate business reasons, they deem such a course wise. Financial embarrassment is not the only legitimate business reason for such a transfer. If such a corporation is engaged in a public employment, the consent of the state to the transfer becomes necessary; but this is simply an additional requirement, and in no wise affects the relation of the majority of the stockholders toward the minority."

The Shattuck Arizona could not excuse the selling of its property upon the ground of insolvency or some real exigency. It was prosperous. It had money and government bonds and quick assets. If its mine was actually approaching exhaustion and copper conditions were bad, as the evidence tends to show, we do not say that it might not have sold all its property, acting in good faith with a just appreciation of the fiduciary relation existing, at any time from the year 1920 on. It could not have been required to mine at a loss or to pursue a discouraging prospect. It was a private

corporation. The public was not interested. If the mine was not worth working out, and conditions suggested that there was nothing for the future except loss by the continuance of the operation, a single or a few stockholders should not prevent majority action honestly taken resulting in a wise sale. But the Shattuck Arizona sold its property only in form. What it did amounted to turning it over to the Delaware corporation on a basis of obvious inequality to finance the exploration and operation of the Denn Arizona property. It did not itself need financing. We do not have a case such as suggested.

3. There is nothing in the Minnesota statutes under which the defendants are organized that controls the case. L. 1876, p. 44, c. 28, § 9, under which the Shattuck Arizona was organized, provided:

"Such corporation may mortgage its property, or any part thereof, by vote of a majority of its stock, but not otherwise; and no real estate of any such corporation, or any interest therein, shall be sold, leased or conveyed, without the consent of a majority in amount of the stockholders."

By L. 1881, p. 46, c. 27, § 5, the statute was amended so as to read:

"Any corporation organized under this act may mortgage, sell or lease its real estate, or any part thereof, if authorized or approved by a majority in amount of its stockholders, but not otherwise."

The statute was left substantially the same by the revision of 1905. See G. S. 1923 (2 Mason, 1927) §§ 7435, 7777. On April 23, 1925, a statute (L. 1925, p. 399, c. 320) authorizing corporations to sell or exchange their property was enacted in the following language:

"Every corporation heretofore or hereafter organized under the laws of this state may at any meeting of its board of directors, sell, lease or exchange all of its property, rights, privileges and franchises upon such terms and conditions as its board of directors deem expedient, and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of two-thirds of

the shares of stock of the company issued and outstanding having voting power, given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of two-thirds of the shares of stock of the company issued and outstanding having voting power. Provided, however, that the certificate of incorporation may require the vote or written consent of a larger portion of the stockholders."

This statute was prior to the consolidation of the two Minnesota companies but subsequent to their incorporation. By L. 1927, p. 510, c. 385, provision is made for the consolidation of corporations and the payment to a nonassenting stockholder for his stock. Statutes of this kind, commonly called appraisal statutes, are discussed in 15 Cornell L. Quarterly, 420, 427; 17 Cornell L. Quarterly, 485; 45 Harv. L. Rev. 233; 19 Cal. L. Rev. 465, 482; 32 Colum. L. Rev. 60; 41 Yale L. Journ. 577.

Long antedating the organization of either of the defendant companies the statutes provided for the dissolution of a corporation, and the general statute is now found in G. S. 1923 (2 Mason, 1927) §§ 8015-8019. The general provisions relative to the formation of mining companies are now found in G. S. 1923 (2 Mason, 1927) §§ 7435, 7777, 7778. The Revision of 1905, § 2838, continued existing corporations with the powers and privileges which they then had under their articles of incorporation and subject to their duties and liabilities. The Minnesota statutes do not affect this case. What was done by the parties was not a sale within their provisions. The defendants invoked none of the statutes. What in the future may be held under L. 1925, p. 399, c. 320, as to the sale of a corporation's assets, and whether the statute constitutionally applies to stockholders or corporations in existence prior to the statute, we do not anticipate. The result in this action is not dependent upon the 1925 statute.

■ The discussion in the two preceding paragraphs is in a sense profitless. In no proper view were the two Minnesota copper companies selling the Arizona copper mines. Their intention was to keep them and develop the Shattuck Denn. In effect the property

of the Shattuck Arizona was to furnish the means of financing. No money passed or was intended to pass. Neither of the two Minnesota corporations could require its stockholders to surrender the stock in exchange for the Shattuck Denn stock. The exchange had to be accomplished by an arrangement in which the stockholders of the Shattuck Arizona dealt with the Delaware company. The Delaware company had no stock except as it issued some of it for the purpose of exchange, and a specified amount for treasury use.

The transfer by bill of sale and deed of the physical assets of the two Minnesota corporations to the Delaware corporation was not such a disposition of corporate assets as was in mind in the cases referred to in the preceding paragraph. This is obvious from the joint letter of the two Minnesota companies to their stockholders which referred to a consolidation. It was intended, so the letter says, that "the properties of both companies" would be combined and there would not be need of "outside financing." If carried out, the stockholders of the Minnesota companies became stockholders of a Delaware company having more extensive powers, and subjected themselves to whatever liability might arise from ownership in the Delaware corporation, and the Shattuck Arizona took the burden of financing or relieving the consolidated companies to the extent of its ready assets. And as before said, it is hardly conceivable that the corporation or majority of the stockholders could compel a minority to accept such liability. Here, if no attack had been made, the merger would be complete after the lapse of so long a time. The trial court puts it this way in its memorandum, and it is correct:

"The manifest purpose of the defendants, and when I say defendants, I mean the two who were served and answered, was to effect a consolidation of their property and resources through and by means of the organization of the Shattuck Denn Mining Corporation under the laws of the state of Delaware. Pursuant to the offer of the Shattuck Denn made to the individual stockholders of the defendants before the court, for exchange of their stock for that of Shattuck Denn, share for share, the latter company, at the time

of the meeting of stockholders of the Shattuck Arizona on October 26, 1925, had acquired a very large control of the stock of both defendants and the former stockholders of the Denn Arizona controlled the Shattuck Denn."

The language of the proposal of the two companies in their letter of July 1, 1925, quoted before, shows a purpose to consolidate. There was no purpose of the Shattuck Arizona to sell because of untoward conditions. It had been prosperous and was in condition to retire. There is no reason apparent why it might not have bought the Denn Arizona and added it to its organization. In any event, there was no exigency justifying a sale. It might have sold, within the line of cases cited above, because it was a business-like thing to do. It did not.

■ The trial court found the division proposed and carried out unfair to the Shattuck Arizona stockholders. Its finding is sustained.

The combined stock of the Shattuck Arizona and the Denn Arizona was 800,000, disregarding a few unissued shares of the Denn Arizona. Under the consolidation, a shareholder in either company received a share in the Shattuck Denn corporation; or, putting it otherwise, all of the shareholders of the Shattuck Arizona received 350,000 shares and those of the Denn Arizona 450,000 shares. On the balance sheets of the two companies the Denn Arizona was without liquid assets, and it was in fact so. No one claims it to be different. The hopeful judgment of the mining men interested was that the potential value of the Denn Arizona was great. With the information furnished by the balance sheets, the Shattuck Arizona stockholders were justified in fearing the proposed exchange. A 7/16 and 9/16 division, the prosperous company receiving the 7/16 and the penniless one 9/16, did not look right. It might turn out that the Shattuck Arizona would yield no more profit; but its money and bonds and current assets would not fail. The Denn Arizona, though unsuccessful for 18 years, might of a sudden become of immense value and justify the hopes of its officers. Mining men are characteristically hopeful. They work and work on, buoyed by a

confident hope that just beyond the ore will show. Ore is where it is; and the property of either company might become immensely rich.

■ The action was commenced on November 7, 1925. The trial commenced three years after the consolidation date of October 26, 1925. Witnesses gave their judgment as to the possibilities of the Denn Arizona, as they saw them when the merger was made. In the meantime explorations had been made, and the claim was that the explorations supported the judgments entertained by the officers of the Shattuck Arizona when the consolidation was effected. One witness ventured that the property was worth from $14,000,000 to $16,000,000. Nothing was shown as to the cost of production. It was at least discretionary with the trial court to allow testimony as to actual explorations made, and values disclosed since the merger, and in certain situations its rejection might be error. See Shoemaker v. Acker, 116 Cal. 239, 48 P. 62. As far as the good faith of the Shattuck officers is concerned, it cannot be important for good faith was found. Again, the plaintiffs were not seeking damages, and what might be the actual or prospective value of the Denn Arizona was not important in determining the relief which they claim they should have. The stockholders suing did not want to participate in the property of the Shattuck Denn. They had rejected all opportunities to do so, and at most the testimony was of value as bearing upon the question of whether there was a fair exchange. Upon this narrow point the court might have considered it; but it was not of such importance as to require a new trial. It was much like inquiring how good the guess or judgment of the defendants was when the consolidation on the basis of 7/16 to 9/16 was made.

■ The facts are stated at length, though necessarily there are omissions. The troublesome question is what ought to be done, the facts being as stated. Minority stockholders are to be protected. That does not mean that they always should get what they think they should have. Majority stockholders, though in the wrong, should not be subjected to every form or measure of penalty. A

court of equity molds its relief to meet the facts. The plaintiffs have brought the defendants into a court of equity on a charge of fraud and conspiracy. The court has found against the charge. It is found that the directors and stockholders of the Shattuck Arizona participating in the consolidation did not commit fraud. The transaction has resulted in the passing of the legal title of the properties to the Shattuck Denn. No one but the plaintiffs have complained; no others now can.

The plaintiffs in number are less than 18/100 of one per cent of the total stockholders of the Shattuck Arizona and less than 23/100 of one per cent of those who voted upon the proposition of consolidation. About 85,000 shares were not voted. The fact that there is such a small minority affects a court of equity when its judgment is invoked in a matter where the results sought are harsh. The plaintiffs particularly want a receiver. One need not be told that it would be the likely ruination of the Arizona properties if a receiver were appointed and litigation started here and in Arizona and perhaps in Delaware. The answer may be that the defendants placed themselves in the position in which they are and should abide its consequences. This is not a satisfactory appeal to a court of equity if the plaintiffs can have their rights adequately protected otherwise.

All know that the copper industry has suffered for many years by the depression, and is altogether in a present bad way. There is no sentimental value in the ownership of copper shares. Aside from money they mean nothing to the plaintiffs. If this litigation could result in putting the plaintiffs back with their holdings as they were in May, 1925, it might be a ruinous result to them. There is evidence that the value of the Shattuck Arizona was then five or six dollars a share. There is evidence that it sold at $18 a share at the time of the trial. The confidential counsel of the plaintiffs, not participating in this appeal, figured its book value at $23, or thereabouts; and there is evidence that at one time it sold for $24.

The plaintiffs will be fairly treated if they are given the highest value, market or intrinsic, which they can find between October 26,

1925, and the date of trial, with six per cent interest from the date which they elect to take; or, if they do not choose that, then take the stock of the Shattuck Denn exchanged on a fair basis. If they do not want this, judgment should be entered against them upon the merits, and they then can use such remedy as they find. The court will find this value, taking more evidence if it finds it necessary. It seems that neither party should be vexed with more litigation, and the court can do justice by both though it proceeds somewhat summarily. If the defendants do not care to accept the finding and order that the court makes as to the amount and time of payment, the order for judgment heretofore made should be carried out and a receiver appointed and the other relief asked given. In working out the final results, the court should so provide that the 597 shares are not left to vex the defendants in further litigation; and compliance by the defendants with the order or finding of the trial court should be prompt. The findings are complete and excellently worked out. There should be but a minimum of labor in bringing the litigation to an end.

Modified and remanded.

ON APPLICATION FOR REARGUMENT.

On November 4, 1932, the following opinion was filed:

PER CURIAM.

Near the close of the opinion we stated that there was evidence that the Shattuck Arizona was worth five or six dollars a share at the time of the so-called consolidation; that there was evidence that it sold at $18 a share at the time of the trial; and that at one time it sold for $24 a share. We do not find evidence sustaining our statement. There was an offer by defendants to prove that the stock of the Shattuck Denn was of substantially such value, but an objection of plaintiffs that it was immaterial was sustained, and it was immaterial upon the plaintiffs' view of the case. There was evidence that the Shattuck Arizona had a book value of $21.43 per share or perhaps $22. The proposed proof was as to the value of the Shattuck Denn and not of the Shattuck Arizona, and in this

respect our statement was in error. The only bearing it could have was because of the fact that the stock for which the Shattuck Arizona was exchangeable share for share was worth the sums suggested. We make this correction, and the motion for reargument is denied.